## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Pursuit Capital Management, LLC, | ) | Case No. 14-10610 (LSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Claridge Associates, LLC, Jamiscott LLC, | ) | |
| Leslie Schneider and Lillian Schneider | ) | |
| collectively as the creditors, transferees, and | ) | |
| assignees of the Estate of Pursuit Capital | ) | |
| Management, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. Proc. No. 16-50083 (LSS) |
| | ) | |
| v. | ) | |
| | ) | Re: Adv. D.I. 1, 7, 26, 28 |
| Anthony Schepis, Frank Canelas, Ruth | ) | |
| Canelas, Northeast Capital Management, | ) | |
| LLC, Pursuit Partners, LLC, Pursuit | ) | |
| Investment Management, LLC, Pursuit | ) | |
| Capital Management Fund I, L.P., Pursuit | ) | |
| Capital Partners (Cayman) Ltd., Pursuit | ) | |
| Capital Master (Cayman) Ltd., Pursuit | ) | |
| Opportunity Fund I, L.P., Pursuit | ) | |
| Opportunity Fund I, Ltd., and Pursuit | ) | |
| Opportunity Fund I Master Ltd., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION[1]

Before the Court is Defendants' Motion to Dismiss Complaint on Jurisdictional

Grounds[2] through which Defendants seek to dismiss or stay this adversary proceeding on

---

[1] The Court need not state findings of fact or conclusions of law on a motion under Fed. R. Civ. P. 12, made applicable by Fed. R. Bankr. P. 7012. *See* Fed. R. Civ. P. 52(a)(3), made applicable by Fed. R. Bankr. P. 7052.

[2] Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, April 29, 2016, D.I. 7 ("Motion to Dismiss"); Defendants' Opening Brief in Support of Their Motion to Dismiss

multiple grounds, some at least nominally jurisdictional, most not.  Plaintiffs and

Defendants have completed their briefing.[3]  I deferred ruling on the Motion to Dismiss

pending a ruling by the Third Circuit on an appeal from an order in the main case.[4]  The

Third Circuit has since ruled[5] and this matter is now ripe for review.

**Background**[6]

  Prior to its bankruptcy filing, Pursuit Capital Management, LLC ("Debtor") was the

general partner of two investment partnerships—Defendant Pursuit Capital Management

Fund I, L.P. ("Capital Fund") and Defendant Pursuit Opportunity Fund I, L.P.

("Opportunity Fund," and collectively with the Capital Fund, the "Feeder Funds") (D.I. 1

¶ 1).  Defendants Anthony Schepis ("Schepis") and Frank Canelas ("Canelas") were

Debtor's sole owners, managers and controlling principals.  They were also the sole owners,

managers and controlling principals of all other entity defendants—(i) Pursuit Partners,

LLC, a broker-dealer ("Pursuit-Broker Dealer"), (ii) Pursuit Investment Management, LLC,

an investment management company ("Pursuit Investment Manager"), (iii) Pursuit Capital

Partners (Cayman) Ltd., an offshore fund, (iv) Pursuit Capital Master (Cayman) Ltd., an

---

Complaint on Jurisdictional Grounds, April 29, 2016, D.I. 8 ("Defendants' Opening Brief");
Declaration of Daniel N. Brogan in Support of Defendants' Motion to Dismiss Complaint on
Jurisdictional Grounds, April 29, 2016, D.I. 9 ("Brogan Declaration").  All references to docket
items are to the adversary proceeding unless otherwise noted.
[3] Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Complaint on Jurisdictional
Grounds, May 31, 2016, D.I. 26 ("Plaintiffs' Answering Brief"); Declaration of Wendy B. Reilly,
Esq. in Support of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Complaint on
Jurisdictional Grounds, May 31, 2016, D.I. 27 ("Reilly Declaration"); Defendants' Reply Brief in
Support of Their Motion to Dismiss Complaint on Jurisdictional Grounds, June 14, 2016, D.I. 28
("Defendants' Reply Brief in Support of Motion to Dismiss").
[4] *See Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, No. 14–10610 (LSS), Adv.
Proc. No. 16–50083 (LSS), 2017 WL 2537234 (Bankr. D. Del. June 9, 2017).  I did, however, permit
factual discovery to go forward while the appeal was pending.  *Id.*
[5] *See Schepis v. Burtch (In re Pursuit Capital Mgmt., LLC)*, 874 F.3d 124 (3d Cir. 2017).
[6] All facts contained in this Opinion are taken from the Complaint (D.I. 1), except as noted, and are
presumed to be true as required on a Rule 12(b)(6) motion, and as discussed more fully below with
respect to the portions of the motion brought under another subsection of Rule 12.

offshore master fund; (v) Pursuit Opportunity Fund I, Ltd., an offshore fund; and (vi) Pursuit Opportunity Fund I Master Ltd., a master fund organized under the laws of the Cayman Islands. Plaintiffs assert that these Defendants, collectively, are a "unitary enterprise" known as the "Pursuit Hedge Fund." Defendant Northeast Capital Management, LLC was formed by Schepis and Canelas to be a successor general partner to Debtor in the Feeder Funds. Defendant Ruth Canelas is the wife of Frank Canelas.[7]

Plaintiffs, in their individual capacities, as well as other investors, including Alpha Beta Capital Partners, L.P. ("Alpha Beta"), were investors in the Capital Fund. (D.I. 1 ¶ 39). By 2009, the Capital Fund ceased making new investments and started to wind down. (D.I. 1 ¶ 39). Litigation ensued as the Debtor and/or other Defendants were sued in multiple jurisdictions. As detailed in the Complaint, in May 2012, the Schneiders commenced arbitration proceedings against Debtor alleging "mismanagement of [their] investment, the misuse of the Capital Fund's remaining assets, and the failure to make distributions . . . promised." (D.I. 1 ¶ 40). After two phases of arbitration, and in two separate and lengthy opinions, the arbitrator awarded the Scheniders approximately $5 million. The Supreme Court of New York confirmed the arbitration awards and issued judgments against Debtor in the amounts awarded by the arbitrator. (D.I. 1 ¶ 40). Those judgments have not been paid. Plaintiffs also allege that prepetition, and during the course of the litigation, Debtor systematically transferred assets for no consideration to various of the other Defendants to make Debtor judgment proof. (D.I. 1 ¶¶ 38, 73).

---

[7] As Ruth Canelas is not alleged to have a management position within the Pursuit Hedge Fund, but rather to be the recipient of certain transfers from Debtor, in this opinion "Canelas" or "Defendant Canelas" will refer to Frank Canelas except where otherwise specified.

Separately, Alpha Beta sued Pursuit Investment Manager, Schepis and Canelas in New York state court asserting tortious conduct in connection with their investments in the Feeder Funds; they also filed a separate arbitration proceeding against the Capital Fund and the Opportunity Fund for similar tortious conduct.[8] The 2010 litigation was settled through a confidential settlement agreement, which, itself, spawned further litigation.

In the meantime, certain Defendants were prosecuting prepetition litigation. In 2008, Defendants Pursuit Broker-Dealer and Pursuit Investment Manager sued UBS Securities LLC in Connecticut state court for losses suffered by the Feeder Funds as a result of collateralized debt obligations sold to the funds by UBS. (D.I. 1 ¶ 52). Damages in excess of $104.5 million plus punitive damages were asserted against UBS. (D.I. 1 ¶ 52). The UBS matter was settled for an unknown amount, and Plaintiffs allege that certain of the settlement proceeds should have gone to Debtor. (D.I. 1 ¶ 52). Plaintiffs assert that under both the Capital Fund limited partnership agreement and the Opportunity Fund limited partnership agreement, Debtor is due an incentive fee of 20% of profits earned by investors in those funds; this fee is termed "carried interest." (D.I. 1 ¶¶ 55, 56). By extension, therefore, Debtor is entitled to 20% of any profits to the Feeder Funds from the UBS proceeds. (D.I. 1 ¶ 57). Plaintiffs allege that Schepis and Canelas secretly formed Defendant Northeast Capital Management one month before the bankruptcy filing to replace Debtor as the general partner of each Feeder Fund in order to seize Debtor's interest in the proceeds of the UBS Litigation. (D.I. 1 ¶¶ 62-67).

---

[8] This background comes from *Alpha Beta Capital Partners, LP v. Pursuit Inv. Mgmt., LLC*, Connecticut Superior Court, judicial district of Stamford/Norwalk, Docket No. X08 FST CV 15-5014970-S (October 14, 2016) ("Connecticut Decision"), D.I. 59 Annex 1.

4

Further, in 2013, Debtor and other Defendants sued Alpha Beta in New York state court.[9] This matter remained pending when the bankruptcy petition was filed and was listed in Debtor's Schedules.

**The Bankruptcy Case**

On March 21, 2014, Schepis and Canelas put Debtor into a voluntary chapter 7 proceeding. Jeoffrey L. Burtch was appointed the chapter 7 trustee ("Trustee"). About one year later, on March 2, 2015, Trustee filed his Motion for an Order Approving Agreement to Settle, Transfer and Assign Certain Claims, Rights and Interests ("Sale Motion")[10] seeking approval of an agreement[11] with Alpha Beta and the Claridge Group (i.e. Claridge Associates, LLC, Jamiscott LLC, Leslie Schneider, and Lillian and Leonard Schneider).[12] Through the Sale Motion and agreement, Trustee sought to administer all assets and causes of action as detailed therein.

In the Sale Motion and agreement, Trustee stated that the only assets listed on Debtor's schedules were claims, specifically: (i) certain prepetition litigation Debtor brought against Alpha Beta and others in the State of New York, defined as the "New York Action" and (ii) potential indemnification claims against the Capital Fund, defined as the "Indemnification Claims." Trustee also recognized that a footnote in Debtor's Statement of Financial Affairs reflected a disbursement of $645,571.22 to Debtor's members in the year

---

[9] *Pursuit Investment Mgmt., LLC v. Alpha Beta Capital Partners, L.P.*, Index No. 652457/2013 (Supreme Court of the State of New York).

[10] Trustee's Motion for an Order Approving Agreement to Settle, Transfer and Assign Certain Claims, Rights and Interests, Mar. 2, 2015, Main Case D.I. 66.

[11] Agreement to Settle Transfer and Assign Certain Claims, Rights and Interests, Mar. 2, 2015, Main Case D.I. 66 Ex. B.

[12] Harris, O'Brien, St. Laurent & Chaudhry LLP and Reed Smith LLP, who were sued by Debtor in the New York Action are also parties to the agreement. Their involvement is not central to this Opinion and will not be mentioned further.

before the bankruptcy filing, defined as the "Potential Avoidance Claim."[13]  And, Trustee stated that the Claridge Group identified two additional potential assets: (i) certain additional rights, claims and causes of action against Debtor affiliates, including fraudulent conveyance actions, defined, collectively with the Potential Avoidance Claim as the "Debtor Claims" and (ii) Debtor's interest in the proceeds of the UBS litigation, defined as the "UBS Claim." These claims, collectively, comprise all of Debtor's assets and/or all sources of recovery for the bankruptcy estate. (Main Case D.I. 66 ¶¶ 7-9, 11).

As the estate had no funds to pursue the claims (Main Case D.I. 66 ¶ 12), Trustee decided to administer them by entering into the agreement "to settle, transfer and assign" the claims on the following terms.  The Claridge Group and Alpha Beta were to pay Trustee $125,000 within twenty days after court approval of the agreement.  In exchange, Trustee was to sell, transfer and convey to the Claridge Group and Alpha Beta, free and clear of all liens, claims and interests, all the right, title and interest of Debtor and the Estate to the Debtor Claims, the Indemnification Claims, the UBS Claim and all Debtor's books and records.  Further, upon receipt of the $125,000 payment, the New York Action was to be settled and dismissed.  The assignments, sales, transfers and conveyances were on an "as is where is" basis, with no representations or warranties of any kind.  And, the agreement was to be submitted to the bankruptcy court for approval through a sale motion under § 363(b) and (f) of the Bankruptcy Code ("Sale Motion").

The Sale Motion was originally scheduled to be heard in March 2015.  Before the objection deadline, Schepis, Canelas, Pursuit Investment Manager, the Opportunity Fund and the Capital Fund ("Objecting Defendants") filed a preliminary objection and a motion

---

[13] Later renamed the Insider Avoidance Claim in the final version of the agreement.

to continue the hearing; they also noticed several depositions.[14] The crux of the objection

was that Trustee was not acting in good faith as Objecting Defendants had made higher

offers to acquire the claims and the Sale Motion did not permit other offers.[15] After further

objections were filed, I established auction procedures, a concept not encompassed in the

Sale Motion as filed. At the auction the only bidders were the Claridge Group and Alpha

Beta, and Objecting Defendants. Consistent with the agreement, the Claridge Group and

Alpha Beta sought to purchase the claims in order to pursue the identified litigation.

Objecting Defendants, who were the targets of the litigation, primarily sought to purchase

the claims defensively (i.e. so that the claims would not be pursued) and to close the

bankruptcy case expeditiously.[16]

---

[14] Objection to Trustee's Motion for an Order Approving Agreement to Settle, Transfer and Assign
Certain Claims, Rights and Interests, Mar. 12, 2015, Main Case D.I. 67 ("Preliminary Objection").
[15] *Id.* Only two paragraphs of the thirteen-page objection speak directly to the avoidance claims.
The entirety of those paragraphs is:

> Paragraphs 2 and 3 of the Agreement would, if approved, purport to
> enable the [Plaintiffs] to take action solely for their benefit while
> using the avoidance powers (referred to as "Debtor Claims" in the
> Agreement) vested by the Bankruptcy Code solely and exclusively
> with a bankruptcy trustee.
>
> While such a transfer might be contemplated in a Chapter 11 case
> (see 11 U.S.C. § 1123(a)(5) and (6)), Chapter 7 of the Bankruptcy
> Code, neither envisions nor contemplates any successor to or
> assignee of the bankruptcy trustee with respect to any avoidance
> actions "assigned by" a chapter 7 trustee.

*Id.* Objecting Defendants' Final Objection to Trustee's Motion for an Order Approving Agreement
to Settle, Transfer and Assign Certain Claims, Rights and Interests (Main Case D.I. 122) simply
incorporates by reference the Preliminary Objection, and does not expound further or cite any legal
authority.
[16] At the conclusion of the auction, Plaintiffs were the only bidder, Defendants having withdrawn
their last bid. After some post-auction wrangling, and a request by Defendants to re-open the
auction, I declined that invitation and entertained Trustee's request to grant the Sale Motion.

On August 10, 2015, I held an evidentiary hearing on the Sale Motion.[17]  At the hearing, Trustee (through a proffer) testified to the auction as well as the improved terms of the agreement ("Agreement").  The Agreement was also provided to the court.  The Agreement provided for:

- a payment to Trustee of $180,001;

- a "contribution" to the bankruptcy estate of 100% of the net (of expenses) recoveries from the Debtor Claims (including, the Insider Avoidance Claim) and the UBS Claim (i.e., all identified claims other than the Indemnification Claim);

- the transfer to Plaintiffs of all of the right, title and interest of Debtor, Trustee and/or the Estate in and to the Debtor Claims (including the Insider Avoidance Claim), the Indemnification Claims and the UBS Claims;

- permission for Plaintiffs (or any one of them) to bring the Debtor Claims (including the Insider Avoidance Claim) and the UBS Claim in this bankruptcy court, with deemed standing;

- the understanding and agreement that the Debtor Claims (including the Insider Avoidance Claim) and the UBS Claim "will be pursued on behalf of the bankruptcy Estate and any net recoveries will be property of the bankruptcy Estate to be distributed in accordance with the priorities established by the Bankruptcy Code;"

- any settlement of claims (other than the Indemnification Claim) to be submitted to the Bankruptcy Court for prior approval in accordance with Federal Rule of Bankruptcy Procedure 9019;

- the dismissal of the New York Action;

- the conveyances on an "as is where is" basis; and

- the Agreement to be submitted to the bankruptcy court for approval through a motion to sell property of the estate pursuant to 11 U.S.C. § 363(b) and (f).

---

[17]  Hr'g Tr., Aug. 10, 2015, Main Case D.I. 196.

After taking the matter under advisement, I subsequently issued a bench ruling granting the

Sale Motion and approving the Agreement.  My bench ruling included the following

reservation:

> Third, the [Objecting Defendants] question the right of the
> trustee to assign the claims as inconsistent with the Bankruptcy
> Code.  They specifically wish to reserve all defenses to [the
> Claridge Group's and Alpha Beta's] ability to prosecute the
> claims on behalf of the estate or otherwise.  It is clear that the
> [Objecting Defendants] must be able to raise any and all
> defenses they have to whatever litigation is brought, and the
> order entered by the Court approving the sale must so
> provide.[18]

I then instructed the parties to confer and submit a form of order embodying that ruling.[19]

Trustee's counsel filed a Certification of Counsel in which he stated that the parties

could not agree on a form of order.[20]  Attached to the Certification of Counsel were three

forms of order—one proposed by each of Trustee, the Claridge Group and Alpha Beta and

Objecting Defendants.[21]  On August 27, 2015, I signed, and on August 28, 2015, the Clerk

of the Court entered, the order approving the sale (the "Sale Order"),[22] which was the form

of order submitted by Objecting Defendants.[23]  As to defenses, the Sale Order provides:

> ORDERED, that notwithstanding anything to the contrary in
> the Agreement, all rights, claims and defenses that may be
> raised or asserted by the [Objecting Defendants] with respect to
> the UBS Litigation, the UBS Claim, the Debtor's Claims, the

---

[18] Hr'g Tr. 14:11–18, Aug. 17, 2015, Main Case D.I. 187.  In response to a question, I also stated: "the intent is to preserve any and all defenses that the [Objecting Defendants] have to raise in this court or any other court." *Id.* 15:11–19.

[19] Hr'g Tr. 15:14–15, Aug. 17, 2015.

[20] Certification of Counsel, Aug. 26, 2015, Main Case D.I. 189.

[21] *See id.* Ex. B–D.

[22] Order Approving Agreement to Settle, Transfer and Assign Certain Claims, Rights and Interests, Aug. 28, 2015, Main Case D.I. 190 ("Sale Order").  The Sale Order also provided that except with respect to the Insider Avoidance Action and the UBS Claim, Plaintiffs were to give Trustee three business days notice before commencing an action not referenced in Debtor's bankruptcy schedules. *See* discussion *infra* Part I.B.(i).

[23] *See* Certification of Counsel, Main Case D.I. 189 Ex. C.

> Insider Avoidance Claims and/or the Indemnification Claims,
> including, without limitation, any right to challenge standing or
> jurisdiction, are expressly reserved and preserved . . . .[24]

In signing the Sale Order, I rejected language in the proposed order submitted by the
Claridge Group and Alpha Beta that would have in any way qualified or limited the
preservation of defenses.[25]

**The Appeal of the Sale Order**

On September 8, 2015, Objecting Defendants appealed the Sale Order to the United
States District Court for the District of Delaware. Objecting Defendants did not seek or
obtain a stay of the Sale Order. On September 26, 2016, the District Court affirmed the
finding of good faith in connection with the sale and dismissed the appeal as statutorily
moot under 11 U.S.C. § 363(m).[26] As for issues about the transferability of the Avoidance
Actions or Plaintiff's ability to prosecute them, the District Court stated:

> I read the record [below] as showing that the parties were
> content in the Bankruptcy Court to put off this issue for another
> day. I do not believe that Appellants preserved an objection to
> the Bankruptcy Court's handling of the issue. Thus, while
> Appellants have certainly preserved their rights to raise the
> issue as a defense to future litigation, I do not think they have
> preserved their rights to raise the issue on direct appeal. I do

---

[24] Sale Order 2.

[25] The language proposed by the Claridge Group and Alpha Beta reads:

> ORDERED, that all rights, claims and defenses that may be raised or
> asserted by the Pursuit Parties with respect to the UBS Litigation, the
> UBS Claim, the Debtor's Clams, the Insider Avoidance Claims
> and/or the Indemnification Claims, including, without limitation,
> any right to challenge standing or jurisdiction, are expressly reserved
> and preserved, provided further, however, for the avoidance of doubt
> (if any), the releases, rights and/or obligations under the Agreement
> are not modified or diminished in any way by this reservation . . . .

Certification of Counsel, Main Case D.I. 189 Ex. D.

[26] *Pursuit Parties v. Burtch (In re Pursuit Capital Mgmt., LLC)*, No. 14–10610–LSS, Civ. No. 15–801–RGA, 2016 WL 5402735 (D. Del. Sept. 26, 2016).

> not think this is an issue that I should be deciding in the first
> instance. Thus, were this the only issue raised, I would simply
> affirm the Bankruptcy Court's Order, with the result that the
> issue would be decided, if necessary, in subsequent litigation.[27]

Objecting Defendants then appealed the District Court's ruling to the United States Court of

Appeals for the Third Circuit. The Third Circuit affirmed, likewise concluding that the

appeal of the Sale Order was statutorily moot under § 363(m).[28] While declining to rule on

the merits of the sale/transfer issues, it also recognized that Objecting Defendants might

have the opportunity to contest the validity of the transfer and/or the ability of Plaintiffs to

pursue the Avoidance Actions in this adversary proceeding.[29]

**The Adversary Proceeding**

Six months after I approved the sale, on February 25, 2016, Plaintiffs filed the

Complaint commencing this adversary proceeding based on the claims they obtained from

Trustee.[30] The Complaint sounds in eleven counts, including fraudulent conveyance claims

asserted under both state law and the Bankruptcy Code, breaches of fiduciary duty and

contract, conversion, unjust enrichment and turnover.[31] At its core, Plaintiffs seek: (i)

---

[27] *Id.* at *3 (citation omitted).

[28] *In re Pursuit Capital Mgmt.*, 874 F.3d at 141 ("We therefore reject the Pursuit Parties' arguments and hold that we cannot give them the remedy they seek without affecting the validity of the sale. Because we cannot do that, this appeal is statutorily moot.").

[29] *Id.* at 140 ("[A]s the Pursuit Parties see it, ownership of the claim, even without the ability to pursue it as an avoidance claim, does not affect the sale's validity because, again, there was an agreed-to "as is, where is" disclaimer included in the final sale agreement. In colloquial terms, the Creditor Group purchased a 'pig in a poke' and assumed the risk that the 'poke' would not contain what had been hoped. But, *at least as to this appeal of the Sale Order*, that reasoning cannot withstand scrutiny.") (emphasis added); *id.* at 141 n.20 ("Nothing we say here is meant to limit the Bankruptcy Court from addressing issues that are rightly before it in the first instance.").

[30] Plaintiffs were authorized by Alpha Beta and the Estate of Lenonard Schneider to bring the claims on their behalf. Complaint ¶ 8.

[31] Count I—Fraudulent Transfer of $645,571 under §§ 548(a)(1)(A) & (B), 544, 550; Count II—Fraudulent Transfer of Debtor's interest in the UBS settlement under §§ 548(a)(1)(A) & (B), 544, 550, Count III—Fraudulent Transfer of Funds Subject to a Judgment for Money Damages under N.Y. Debt. & Cred. Law § 273-a; Count IV—Breach of Fiduciary Duty (Care); Count V— Breach of the Duty of Loyalty; Count VI—Breach of Contract; Count VII—Conversion; Count VIII—Aiding

return of the transfer of $645,571 from Debtor to Schepis, Canelas, and Ruth Canelas (i.e. the Insider Avoidance Action) as well as any transfer to Northeast Capital Management of Debtor's interest in the proceeds of the UBS litigation (collectively, and together with any and all other improper transfers, the "Avoidance Actions"), and (ii) damages for the self-dealing transactions including in connection with the improper transfer of funds, improper removal of Debtor as general partner of the Feeder Funds, and misuse of the Feeder Funds.

Defendants responded by moving to dismiss. In the Opening Brief, Defendants make eleven arguments why some or all the counts of the Complaint should be dismissed. After briefing and supplemental briefing,[32] including on whether Defendants waived arguments not fully formed in their Opening Brief, and two arguments, the matter is now ready for decision.

## Jurisdiction

Bankruptcy jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C. § 1334 and § 157(a) and (b) as the Complaint contains counts that are either core or non-core. The court can enter an order on this Motion to Dismiss as it relates to each Count of the Complaint consistent with the Constitution as any order is not a final order.

---

& Abetting Breaches of Fiduciary Duty; Count IX—Unjust Enrichment; Count X—Accounting; Count XI—Turnover of Property of the Estate. Counts I and VII–IX are against all Defendants. Counts II–VI and X–XI are against all Defendants except Ruth Canelas.

[32] Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, Jan. 24, 2017, D.I. 58 ("Plaintiffs' First Supplemental Brief"); Supplemental Brief in Support of Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, Jan. 24, 2017, D.I. 59 ("Defendants' First Supplemental Brief"); Defendants' Response to Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, Feb. 7, 2017, D.I. 66 ("Defendants' Second Supplemental Brief"); Plaintiffs' Brief in Response to Defendants' Supplemental Brief in Support of Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, Feb. 7, 2017, D.I. 67 ("Plaintiffs' Second Supplemental Brief").

**Analysis**

**I.    The Complaint Will Not Be Dismissed on Any Jurisdictional Ground**

A court addresses jurisdictional arguments first because it if does not have subject matter jurisdiction or personal jurisdiction over the parties, it should not reach the merits of the disputes.[33] Here, Defendants label many arguments jurisdictional. As the only clear jurisdictional argument is the one challenging personal jurisdiction over Defendants organized under Cayman Islands law, I will address that matter first.

**A. Personal Jurisdiction Exists over Defendants Organized Under Cayman Islands Law**

Defendants assert that this Court lacks personal jurisdiction over four defendants: Pursuit Capital Partners (Cayman) Ltd., Pursuit Capital Master (Cayman) Ltd., Pursuit Opportunity Fund I, Ltd., and Pursuit Opportunity Fund I Master Ltd. (collectively "Cayman Defendants") each of which is organized under the laws of the Cayman Islands. In their Opening Brief, Defendants argue that Plaintiffs have not alleged a sufficient basis for either general or specific jurisdiction because: (i) each Cayman Defendant is domiciled outside of the United States; and (ii) Plaintiffs have not alleged any meaningful contact with the United States.[34] In their Answering Brief, Plaintiffs respond that personal jurisdiction is established through: (i) the "flow of funds to and from domestic Defendants and the Cayman Defendants" which activity was directed at the United States; (ii) availing themselves of courts within the United States as plaintiffs in multiple actions and (iii) being "part and parcel of the 'unitary enterprise' comprising the Pursuit Hedge Fund."[35]

---

[33] *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).
[34] Defendants' Opening Brief 10–13.
[35] Plaintiffs' Answering Brief 15.

Once a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence.[36] In reviewing a complaint under Rule 12(b)(2), as with Rule 12(b)(6), plaintiffs are entitled to have their allegations taken as true and all factual disputes resolved in their favor.[37] Unlike Rule 12(b)(6), however, review under Rule 12(b)(2) is not limited to the face of the pleadings.[38] If an opposing affidavit contradicts the complaint's allegations, a plaintiff must present similar evidence in support of personal jurisdiction.[39] Without an opposing affidavit, courts review the complaint for the sufficiency of its allegations, and the plaintiff need only plead a prima facie case of personal jurisdiction.[40] A plaintiff may establish a prima facie case by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction."[41] A pre-answer, pre-discovery or a pre-trial motion is not the appropriate place to hold a plaintiff to its ultimate burden.[42]

---

[36] *See Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992) (citing *Time Share Vacation v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 65 (3d Cir. 1984)); *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)).

[37] *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 95 n.1 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).

[38] *See Carteret Sav. Bank, FA*, 954 F.2d at 142 & n.1.

[39] *See Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330–31 (3d Cir. 2009); *see also In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 382 n.21 (M.D. Pa. 2009) ("[A]lthough the burden of persuasion always lies with the non-moving party, the burden of production rests initially with the party moving for dismissal under Rule 12(b)(2)."); *Capmark Fin. Grp. Inc. v. Lin (In re Capmark Fin. Grp. Inc.)*, 479 B.R. 330, 338 (Bankr. D. Del. 2012) ("the defendant must provide an affidavit contradicting the jurisdictional allegations made by the plaintiff").

[40] *See Miller Yacht Sales*, 384 F.3d at 97; *see also Carteret Sav. Bank, FA*, 954 F.2d at 142 n.1 ("if court does not conduct evidentiary hearing on motion to dismiss for lack of in personam jurisdiction, plaintiff need only plead prima facie case to survive the initial motion, but must eventually establish jurisdiction by a preponderance of the evidence") (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

[41] *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987).

[42] *See AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust)*, 335 B.R. 309, 316 (Bankr. D. Del. 2005); *see also Oxford First Corp. v. PNC Liquidation Corp.*, 372 F. Supp. 191, 193 n.2 (E.D. Pa. 1974) ("[T]he jurisdictional facts in the instant case are so inextricably intertwined

Here, Defendants' argument rests on the sufficiency of the allegations in the Complaint; they did not file any affidavits in support of their personal jurisdiction defense. My decision, therefore, examines the Complaint's allegations.

Personal jurisdiction over a defendant may be either general or specific.[43] A court may exercise general jurisdiction when a plaintiff's claim arises out of a defendant's "continuous and systematic" contacts with the relevant forum.[44] A court may exercise specific jurisdiction when a plaintiff's claim arises out of a defendant's forum-related activities.[45]

A court may assert general jurisdiction over a foreign corporation when the corporation's "affiliations with the [relevant forum] are so 'continuous and systematic' as to render [it] essentially at home in the [relevant forum]."[46] A corporation is generally "at home" in the "paradigm all-purpose forums" of its "place of incorporation and principal place of business."[47] Corporations are usually only subject to general jurisdiction in the forum where they are incorporated or have their principal place of business.[48] There is no dispute here—nor do Defendants argue—that the United States (not just the state of Delaware) is the relevant forum for purposes of personal jurisdiction in bankruptcy courts.[49]

---

with the facts necessary to prove ultimate liability that it would be unfair to dismiss for lack of personal jurisdiction at this preliminary stage.").

[43] *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (en banc).

[44] *See id.*

[45] *See id.*

[46] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)).

[47] *Chavez*, 836 F.3d at 223 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).

[48] *See id.* at 223 & n.97 (quoting *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)).

[49] *See, e.g.*, Defendants' Opening Brief. *See also Klingher v. Salci (In re Tandycrafts, Inc.)*, 317 B.R. 287, 289 (Bankr. D. Del. 2004) ("Where service is made under Rule 7004(d), the defendant 'need only have minimum contacts with the United States to satisfy Fifth Amendment due process.'") (quoting *Brown v. C.D. Smith Drug Co.*, No. Civ. A. 98–494–SLR, 1999 WL 709992, at *3 (D. Del. Aug. 18, 1999)). Schepis, Canelas and all non-individual Defendants were served at the same address: 34

As I noted at argument, the briefs of both parties were rather conclusory on personal jurisdiction, citing cases to establish the general standards, but not drilling down on the application of those standards to the Complaint. Upon questioning, each position came into better focus.[50] At argument, Plaintiffs contended that the allegations in the Complaint that each Cayman Defendant has its principal place of business in the United States subjected each to the general jurisdiction of this Court.[51] They also suggested that the Cayman Defendants should not be surprised to find themselves in a United States court because they had United States based investors, were managed by people who reside in the United States, have their principal place of business in the United States and were accepting and releasing funds back and forth to domestic entities all with their interrelated entities.[52] Thus, Plaintiffs conclude that personal jurisdiction over the Cayman Defendants does not offend "traditional notions of fair play and substantial justice."[53]

At argument, Defendants countered that the Cayman Defendants did not have their principal places of business in the United States, but rather that each conducted its business in the Cayman Islands. They correctly point out that the Complaint actually alleges that the Cayman Defendants each have a "principal office" in Connecticut. And, they argue that simply having a contract with an investment manager "who makes investment management

---

East Putnam Avenue in Greenwich Connecticut. Cert. of Service, Mar. 2, 2016, D.I. 3-1. The Cayman Defendants did not move to dismiss for insufficient service of process.

[50] Notwithstanding the argument that the flow of funds among the entities supported personal jurisdiction, at argument Plaintiffs acknowledged that there were no specific allegations in the Complaint detailing the flow of funds, suggesting that jurisdictional discovery could bring such conduct to light.

[51] Hr'g Tr. 67:20–22, Nov. 30, 2016; *see also* Hr'g Tr. 68:22–23, Nov. 30, 2016 ("We alleged that they have their principal places of business in the U.S.").

[52] Hr'g Tr. 72-73, Nov. 30, 2016.

[53] *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985) (quoting *Int'l Shoe*, 326 U.S. at 316).

decisions under a contract in New York" does not make a Cayman entity subject to jurisdiction in New York (or, presumably, anywhere in the United States).[54] Based on this argument, Defendants contend that the mere presence of an office in Connecticut would not meet the Supreme Court's jurisdictional test enunciated in *Hertz Corp. v. Friend*.[55]

In *Hertz*, the Supreme Court examined various competing circuit court decisions discussing the standard for corporate citizenship in the context of diversity jurisdiction.[56] The Supreme Court then announced a definitive standard, and in doing so it noted that the purpose of this jurisdictional exercise is to determine "where a corporation is least likely to suffer out-of-state prejudice when it is sued in a local court."[57] The Supreme Court ruled:

> We conclude that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's 'nerve center.' And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).[58]

While it is not altogether clear that the "nerve center" standard enunciated in *Hertz* should be extended to the Rule 12(b)(2) context, because Defendants argued this standard and Plaintiffs did not take issue with that suggestion, I will apply it here.

The allegations in the Complaint that support Plaintiffs' jurisdictional arguments regarding the Cayman Defendants include the following:

---

[54] Hr'g Tr. 96, Nov. 30, 2016.
[55] *Hertz Corp. v. Friend*, 559 U.S. 77 (2010); *see* Hr'g Tr. 94:19–25, Nov. 30, 2016.
[56] 28 U.S.C. § 1332(c)(1) provides that a corporation shall be a citizen of a state where it is incorporated and "where it has its principal place of business."
[57] *Hertz Corp.*, 559 U.S. at 92.
[58] *Id.* at 92-93.

- Each of the non-individual Defendants, including the Cayman Defendants, maintain its principal office at 34 East Putnam Avenue in Greenwich, Connecticut.[59]

- Schepis and Canelas both reside in Connecticut;[60]

- The Cayman Defendants are organized under the laws of the Cayman Islands.[61]

- The Capital Master Fund and the Opportunity Master Fund are "controlled completely" by Defendants Schepis and Canelas.[62]

- Defendants Schepis and Canelas control the Cayman Defendants "by virtue of their positions as two of [their] three board members."[63]

- "At all relevant times, Schepis and Canelas were the sole owners, managers, and controlling principals of the Debtor and a set of interrelated enmeshed entities, which Defendants have described in various court filings as a 'unitary enterprise' known as the 'Pursuit Hedge Fund.'"[64]

- Defendants, including the Cayman Defendants, were "at all relevant times, owned and/or controlled by Defendants Schepis and Canelas and were used by Schepis and Canelas as their alter egos and instrumentalities."[65]

- Schepis has testified in other litigation that "the Pursuit Hedge Fund and its component entities were, for all intents and purposes, 'Anthony Schepis and Frank Canelas.'"[66]

- "[A]ll non-individual Defendants are part of the 'Pursuit Hedge Fund,' a self-described 'unitary enterprise' of related entities under the control of two individuals, Defendants Frank Canelas and Anthony Schepis.  The entities making up the Pursuit Hedge Fund were, at all relevant times, owned and/or controlled by Defendants Schepis and Canelas and were used by Schepis and Canelas as their alter egos and instrumentalities."[67]

---

[59] Complaint ¶¶ 11–19.

[60] *Id.* ¶¶ 9, 10.

[61] *Id.* ¶¶ 15–16, 18–19.

[62] *Id.* ¶¶ 16, 19.

[63] *Id.* ¶¶ 15, 18.

[64] *Id.* ¶ 2.

[65] *Id.* ¶ 28.

[66] *Id.* ¶ 33.

[67] *Id.* ¶ 28.

These allegations, taken as true and accorded all reasonable inferences, lead me to conclude that Plaintiffs have made the prima facie showing necessary to withstand the Cayman Defendants' facial attack on the Complaint. The allegations that each Cayman Defendant maintains its principal office in Connecticut (and, at the same address as other non-individual Defendants), that Schepis and Canelas, Connecticut residents, are two of the three members of the board of directors, and that Schepis and Canelas completely control the Cayman Defendants, support a conclusion that Connecticut is where all decisions are made.[68] Further, the Cayman Defendants are not multi-national conglomerates with multiple offices across the globe, or even the country. There are only two locales that any party has asserted could be the nerve center of the Cayman Defendants—Connecticut or the Cayman Islands. Plaintiffs have alleged enough facts in the Complaint to suggest that Connecticut is where all decisions are made.

---

[68] Once a plaintiff establishes a prima facie case, "the burden shifts to the moving party to 'present a *compelling* case that the presence of some other considerations would render jurisdiction unreasonable and would make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent.'" *In re Capmark*, 479 B.R. at 341 (citation omitted). But in *Daimler AG v. Bauman*, the Supreme Court noted that the "multipronged reasonableness check" enunciated in *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113-14 (1987) was "to be essayed when *specific* jurisdiction is at issue . . . . When a corporation is genuinely at home in the forum State, however, any second-step inquiry would be superfluous." *Bauman*, 571 U.S. at 139 n.20. Justice Sotomayor, in a separate concurrence, disagreed with this analysis, noting that Circuit Courts of Appeals were unanimous (until the Court's ruling, that is) in applying the reasonableness prong to general jurisdiction. *Id.* at 144 n.1 (Sotomayor, J., concurring). Here, Plaintiffs' allegations are sufficient to support a conclusion that the Cayman Defendants are at home in Connecticut and thus subject to general jurisdiction, obviating the need for a second-step reasonableness inquiry. But, even if I were to do a reasonableness analysis, I would find, for purposes of this Motion to Dismiss, that given Schepis' and Canelas' total control over the Cayman Defendants, it is reasonable that the Cayman Defendants defend this action in the United States. At argument, Defendants asserted that subjecting the Cayman Defendants to the general jurisdiction of this court would be "earth-shattering," have "wide reaching" ramifications from a tax liability investor standpoint," and "potentially rock the capital markets and the hedge funds," and suggested that the allegations in the Complaint may not be true. As previously stated, the Cayman Defendants did not submit any evidence regarding the location where decisions are made. As such, Defendants' doomsday scenario is unconvincing even if a concern.

For this reason, the Motion to Dismiss the Cayman Defendants based on personal jurisdiction is denied.

### B. Plaintiffs Have Standing to Assert the Causes of Action in the Complaint

#### (i) The Three-Day Notice Period in the Sale Order Does Not Serve as a Basis to Dismiss the Complaint at This Stage of the Proceedings

The Sale Order imposed a notice obligation on Plaintiffs prior to commencing certain causes of action. It provides:

> ORDERED, that the Agreement is modified as follows: except with respect to the UBS Claim and the Insider Avoidance Action, the [Plaintiffs] will provide the Trustee with three business days notice before commencing any action in the Bankruptcy Court on behalf of the Debtor asserting claims that were not referenced in the Debtor's bankruptcy schedules. If the Trustee objects to the assertion of any such claim, then the [Plaintiffs] shall obtain an Order from the bankruptcy court before commencing any such action in the Bankruptcy Court. The standard for asserting such claims will be the 'colorable claim' standard set forth in the Third Circuit's Cybergenics case, 330 F.3d 548, provided, however, that only the Trustee shall have standing to object. With respect to the UBS Claim, the [Plaintiffs] may pursue such non-scheduled claims without following the procedure described above, provided that the relief requested in such action will not result in the Debtor and/or the Estate or the Trustee being re-installed as a general partner of any of the Pursuit Funds, other than for the limited purpose of collecting funds it is due, including without limitation any incentive fee or carried interest. If the proposed action requests such relief, then the [Plaintiffs] shall follow the procedure for non-scheduled claims . . . .[69]

Defendants argue that Counts IV-XI should be dismissed for lack of standing because Plaintiffs did not plead in the Complaint that they complied with the Sale Order's three-day notice requirement.[70] Defendants also assert that Counts I-III should be dismissed as a

---

[69] Sale Order 1-2. In their competing proposed form of sale order, Defendants did not suggest any proposed revisions to this provision. *See* Main Case D.I. 189.

[70] Defendants' Opening Brief 10; Defendants' Reply Brief in Support of Motion to Dismiss 5–7.

sanction for this failure.  In response, Plaintiffs contend that this "assertion is both factually inaccurate and legally irrelevant."[71]  They also filed the declaration of Plaintiffs' counsel attesting that Plaintiffs provided more than three business days' notice to counsel for Trustee before commencing the adversary proceeding.[72]  Defendants moved to strike the declaration.[73]

Initially, it is not clear that Defendants are in a position to enforce the obligation contained in the Sale Order as, by its terms, it is an obligation running to Trustee.[74]  Further, even if Defendants can enforce this obligation, it is not clear that the failure to meet this obligation creates a lack of standing defense or an obligation to affirmatively plead compliance with the three-day notice requirement.[75]  The Sale Order does not undercut constitutional standing as the requirement does not implicate whether Plaintiffs have suffered an injury in fact, traceable to Defendants, which can be redressed by judicial decision.[76]  Nor does the three-day notice requirement implicate statutory standing, which is discussed below.

But, assuming for the sake of argument that the three-day notice requirement implicates some type of standing, I will treat this aspect of the Motion to Dismiss as one for

---

[71] Plaintiffs' Answering Brief 9.

[72] Reilly Declaration ¶ 3.

[73] Defendants' Motion to Strike Portions of the Declaration of Wendy B. Reilly, Esq. in Support of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds, June 14, 2016, D.I. 29.

[74] Trustee is aware of the lawsuit and has not petitioned the court for any relief.

[75] The entirety of this argument in Defendants' Opening Brief is two paragraphs; no legal authority is cited.  Plaintiffs' Answering Brief is no better, as it is one paragraph with no citation to legal authority.

[76] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The "irreducible constitutional minimum" of standing requires a plaintiff to have "(1) [suffered] an injury in fact, (2) [that] is fairly traceable to the challenged conduct of the defendant, and (3) [that] is likely to be redressed by a favorable judicial decision." *Id.*

summary judgment and permit Defendants to take discovery on the issue raised in the

Reilly Declaration.[77] The factual question at issue is a simple one and can be confirmed or

refuted by an interrogatory to Trustee.[78]

For the reasons stated, I will deny the Motion to Dismiss on this ground as to Counts

IV-XI. The request that Counts I-III be dismissed as a sanction is denied as Defendants

have stated no basis on which any sanction is warranted much less the draconian sanction

they request.

### (ii) Plaintiffs Have Statutory Standing to Commence This Adversary Proceeding

Defendants move to dismiss Counts I-III on the basis that Trustee could not sell the

fraudulent conveyance actions as they were not property of the estate, nor could Trustee sell

his avoidance powers. Distilled to its essence, Defendants contend that in a chapter 7 case

only the trustee may bring a fraudulent conveyance action. Both § 548(a)(1)[79] and § 544(b)[80]

provide that "the trustee may" bring actions to avoid fraudulent transfers. Plaintiffs are not

Trustee, Defendants argue, so Plaintiffs may not prosecute these claims. Defendants rely

---

[77] *See* Reply in Support of Defendants' Motion to Strike Portions of the Declaration of Wendy B. Reilly, Esq. in Support of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss Complaint on Jurisdictional Grounds ¶ 4 n.1, July 5, 2016, D.I. 34.

[78] If, after inquiry, Defendants are not satisfied, they can submit appropriate declarations. And, because the briefs are devoid of any authority for the proposition that a breach of the Sale Order is a jurisdictional issue, I will also require further briefing.

[79] Section 548(a)(1) provides in pertinent part: "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . ." 11 U.S.C. § 548(a)(1).

[80] Section 544(b)(1) provides in pertinent part: "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

primarily on the Third Circuit's two *Cybergenics* decisions[81] and specifically argue that

*Cybergenics I* stands for the proposition that fraudulent transfer claims are not property of the

estate and, as such, the claims "asserted in Counts I-III in the Complaint could not have

been acquired from the Trustee and the Plaintiffs lack standing to prosecute them."[82]

Plaintiffs respond that neither the Bankruptcy Code nor Third Circuit precedent

prohibits the sale of fraudulent transfer actions.  They contend that the holding in

*Cybergenics I* does not address the ability of a trustee to sell fraudulent conveyance claims.

And, relying on *Cybergenics II*, Plaintiffs argue that a bankruptcy court has equitable power

to permit the sale of fraudulent transfer claims and their prosecution by non-trustees.

Plaintiffs also distinguish Defendants' cases, but, unfortunately, do not provide an

affirmative analysis for the proposition that avoidance actions are property of the estate or

provide a roadmap for how to use the court's equitable powers to permit non-trustees to

bring the claims in the instant scenario.

Because the parties base much of their argument on *Cybergenics I* and *II*, I will

analyze those cases in detail as they merit a close examination and suggest an appropriate

outcome.[83]

---

[81] *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 226 F.3d 237 (3d Cir. 2000) ("*Cybergenics I*") and *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc) ("*Cybergenics II*").

[82] Defendants' First Supplemental Brief 2.

[83] At oral argument on the Motion to Dismiss, Defendants sought to argue the statutory standing issue, but admitted the issues had not been briefed.  Hr'g Tr. 36:9–38:21, 114:15–116:19, Nov. 30, 2016.  I did not entertain argument at that time, but permitted supplemental briefing on statutory standing as well as whether Defendants' failure to raise that defense constituted a waiver or otherwise precluded Defendants from raising the defense.  Plaintiffs contend that (i) the statutory standing argument was waived as it was not raised in the Opening Brief; (ii) that this defense is statutorily moot or an end run around the Sale Order; and (iii) Rule 12(g)(2) precludes multiple rounds of briefing on Rule 12 grounds.  Plaintiffs' First Supplemental Brief. Defendants counter that (i) standing is an issue of subject-matter jurisdiction that can be raised at any time; (ii) § 363(m) and statutory mootness apply in the appeal context, not in this context; and (iii) in any event, the Sale

### The Third Circuit's Cybergenics Decisions

#### (a) Cybergenics I

In *Cybergenics I*, a creditors' committee in a chapter 11 case sought court approval to bring a derivative action on the estate's behalf to recover a fraudulent conveyance after the debtor refused to do so. Would-be defendants opposed the committee's motion arguing that the fraudulent conveyance claims had been sold as part of a § 363 sale earlier in the Cybergenics bankruptcy case. The bankruptcy court granted the committee's request. It did not, however, decide at that time whether the claims had been previously sold. In due course, the creditors' committee filed a complaint in the district court asserting state-law based fraudulent conveyance claims through § 544(b); the defendants moved to dismiss on

---

Order preserved the standing defense. Defendants' Second Supplemental Brief. While Defendants should have raised and fully briefed the standing defense in the initial round of briefing, I will entertain the argument now. First, while statutory standing is not a subject matter jurisdiction defense, it is also not a defense that is waived if not raised in a Rule 12(b) motion to dismiss. Only defenses under Rule 12(b)(2) (lack of personal jurisdiction), Rule 12(b)(3) (improper venue), Rule 12(b)(4) (insufficient process) and Rule 12(b)(5) (insufficient service of process) are waived if not made in an initial motion to dismiss. Fed. R. Civ. P. 12(h)(1). Other legal defenses, including statutory standing, may be made in an answer, a motion for judgment on the pleadings or at trial. Fed. R. Civ. P. 12(h)(2). Second, Plaintiffs did not cite any case law that explores statutory mootness and/or § 363(m) in this or a similar context (i.e. where a sale order preserves defenses and assets are sold "as is where is"). The Tenth Circuit's decision in *Search Mkt. Direct, Inc. v. Jubber (In re Paige)*, 685 F.3d 1160 (10th Cir. 2012) provides some guidance. In *In re Paige*, the Tenth Circuit concludes that when a sale order contains a caveat that a free and clear sale is subject to defenses in a pending adversary proceeding, a determination to close on the sale without a final order on those defenses does not render statutorily moot an appeal from a decision on the merits of that defense rendered in the adversary proceeding. *Id.* at 1190-91. Finally, while I do not take lightly the Third Circuit's admonition in *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320-21 (3d Cir. 2015) that a trial court commits reversible error (albeit in that case harmless error) should it entertain serial motions to dismiss, and that it is not good practice to do so, the Motion to Dismiss has been under advisement for some time and if I were to decline to rule on defenses sufficiently briefed, the defense could be raised in a subsequent phase of the litigation. *Compare with Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, Bankr. Case No. 15-12284-LSS, Civ. No. 17-1461-LPS, 2018 WL 4521941, at *19 n.32 (D. Del. Sept. 21, 2018) (ruling on an alternative ground because of the high standard for equitable mootness, the considerable effort the parties spent on the issue and because "the appeal has been pending for quite a while"). Litigants should not take my determination here to consider arguments not sufficiently raised in an opening brief as license to file serial motions to dismiss.

the same grounds. The district court granted the motion to dismiss ruling that the claims were property of the estate that had been previously sold in the § 363 sale.

On appeal, the Third Circuit reversed. In order to answer the question of whether the fraudulent conveyance claims had been sold in the earlier § 363 sale, the Third Circuit started with the sale order and the agreement at issue. This review revealed that the sale was of "all assets of Cybergenics as debtor and debtor in possession."[84] The Third Circuit therefore honed its inquiry to the following question: were the state-law based fraudulent conveyance claims assets of Cybergenics? If so, the claims were included in the sale; if not, they were not. The Third Circuit concluded that state-law based fraudulent conveyance claims are not assets belonging to a debtor. Examining the nature of fraudulent transfer actions, the court ruled that outside of bankruptcy fraudulent conveyance claims belong to a debtor's creditors. It further ruled that the filing of the bankruptcy case and the avoidance power created by § 544(b)[85] did not change that result. The Court concluded therefore, that the fraudulent conveyance claims on which the committee sued did not belong to Cybergenics, and therefore were not sold in the earlier § 363 sale of Cybergenics' assets.

### (b) Cybergenics II

The Third Circuit having ruled that the claims were not sold, the underlying fraudulent conveyance action proceeded. On remand, the defendants filed another motion to dismiss, which included an argument based on the Supreme Court's decision in *Hartford Underwriters*[86] that the creditors' committee could not bring a fraudulent conveyance action under § 544 because only "the trustee may" do so. The district court granted the motion to

---

[84] *Cybergenics I*, 226 F.3d at 241.
[85] Section 548 claims were not an issue in the case.
[86] *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1 (2000).

dismiss finding dispositive *Hartford Underwriters'* determination that identical language in

§ 506(c) of the Bankruptcy Code (i.e. "the trustee may") precluded an individual creditor

from prosecuting a surcharge action.  Once again, the Third Circuit reversed.

　　While on the surface, the issue in *Cybergenics II* appeared to be the same as in *Hartford*

*Underwriters*,[87] the Third Circuit saw it differently.  The Third Circuit read the *Hartford*

*Underwriters* case to be contextual, and styled the issue before the Supreme Court as "one of

a *nontrustee's right* unilaterally to circumvent the Code's remedial scheme."[88]  In contrast, the

Third Circuit styled the question before it in *Cybergenics II* to be "a *bankruptcy court's equitable*

*power* to craft a remedy when the Code's envisioned scheme breaks down."[89]  Having

framed the question, the Third Circuit turned to three sources to answer it—a textual

analysis, an examination of the court's equitable powers and pre-Code practice.

　　Because a committee sought to prosecute the action, the Third Circuit's textual

analysis begins with the role of creditors' committees in a chapter 11 case.  Analyzing

§§ 1109(b)[90] and 1103(c)(5),[91] the Third Circuit concludes that the Bankruptcy Code

envisions creditors' committees playing a central role in chapter 11 cases.  Section 1109(b)

---

[87] The Third Circuit recognized a presumption of statutory interpretation.  *Cybergenics II*, 330 F.3d at 559.  *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 634 (1993) ("the usual presumption of statutory interpretation [is] that the same term carries the same meaning whenever it appears in the same Act").

[88] *Cybergenics II*, 330 F.3d at 552-53.  The Third Circuit also referenced the famous footnote 5, in which the Supreme Court specifically stated in was not addressing "whether a bankruptcy court can allow other interested parties to act in the trustee's stead" as the creditor in *Hartford Underwriters* sought no such approval from the bankruptcy court.  *Cybergenics II*, 330 F.3d at 558 (quoting *Hartford Underwriters*, 530 U.S. at 13 n.5).

[89] *Id.* at 553.

[90] Section 1109(b) provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).

[91] Section 1103(c)(5) provides: "A committee appointed under section 1102 of this title may— . . . (5) perform such other services as are in the interest of those represented."  11 U.S.C. § 1103(c)(5).

permits a committee to appear and be heard in any matter, putting it in a position to play "a vibrant and central role in [c]hapter 11 adversarial proceedings."[92]  Section 1103(c)(5), a catch-all provision, permits a committee to "perform such other services as are in the interest of those represented" and "suggests that Congress intended for creditors' committees to perform services on behalf of the estate."[93]  Further, § 1103(c)(5) reflects that "Congress consciously built a measure of flexibility" into the services a committee may perform.[94]  But these two sections, standing alone, did not support the conclusion that the committee should be accorded standing to sue on behalf of the estate.  Rather, notwithstanding the centrality of the committee in a chapter 11 case, these sections "provide[d] at best indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing upon those committees."[95]

For "more direct insight into bankruptcy courts' powers,"[96] the Third Circuit turned to § 503(b)(3)(B).  Section 503(b)(3)(B) allows courts to grant a priority in payment for the expenses of a "creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor."[97]  The litigants and amicus urged opposing positions on the interpretation of this section, including that:

- § 503(b)(3)(B) permits creditors, with court authorization, to prosecute causes of action on behalf of debtors because it would be nonsensical to permit reimbursement to a creditor who recovers transferred property if standing to recover is limited exclusively to the trustee;[98]

- § 503(b)(3)(B) derives from section 64(a)(1) of the Bankruptcy Act of 1898, which courts interpreted to authorize derivative standing with the approval of the trustee or

---

[92] *Cybergenics II*, 330 F.3d at 562.
[93] *Id.* at 563.
[94] *Id.* at 562-63.
[95] *Id.* at 563.
[96] *Id.*
[97] 11 U.S.C. § 503(b)(3)(B).
[98] *Cybergenics II*, 330 F.3d at 563.

27

court, which served a gatekeeping function, and § 503(b)(3)(B) continues that policy;[99]

- courts interpreting § 503(b)(3)(B) have consistently held that this section does not confer standing to creditors, but "merely allows the recovery of expenses incurred in actions that a creditor has a *direct* right to bring;"[100]

- even if § 503(b)(3)(B) confers standing to commence an action, it confers such standing only on "a creditor"—not a creditors' committee.[101]

After considering these arguments, the Third Circuit determined that the "most natural reading of § 503(b)(3)(B) is that it recognizes and rewards monetarily the practice of permitting creditors' committees, with court authorization, to pursue derivative actions."[102] Paired with § 1103 and § 1109, the Court concluded that Congress approved of derivative standing. But because none of these three sections, singly or together, expressly authorized derivative standing, the Third Circuit next turned to "the bankruptcy courts' equitable power to craft flexible remedies in situations where the Code's causes of action fail to achieve their intended purpose."[103]

Congress intended that fraudulent conveyances be recovered in order to maximize the value of the estate, and vested in the trustee the power and duty to bring such actions in order to achieve that goal.[104] When a trustee refuses to bring the action, the bankruptcy court can invoke its equitable powers to effect the result the Bankruptcy Code was designed to obtain even if the remedy was not directly authorized by the Code.[105] In *Cybergenics II*, the remedy crafted was permitting a chapter 11 creditors' committee to sue derivatively on

---

[99] *Id.* at 563-64.
[100] *Id.* at 564.
[101] *Id.*
[102] *Id.*
[103] *Id.* at 567.
[104] *Id.* at 568.
[105] *Id.*

behalf of the estate. The Court was satisfied that § 544 did not foreclose the substitution of

the court for the trustee as the gatekeeper for the prosecution of avoidance actions to benefit

the estate when necessary to further that goal.[106] And, the Court held that granting

derivative standing to a committee was consistent with the public policy concerns

underpinning chapter 11 cases.[107]

### Application to the Instant Matter

Per *Cybergenics I*, I look to the Sale Order and the Agreement to determine what was

ordered and what relief Trustee and Plaintiffs were granted. Here, the Order approves the

Agreement. Under the Agreement, all of the right, title and interest of *Debtor, Trustee and the*

*Estate* to the claims and Debtor's books and records were sold, transferred and conveyed, to

Plaintiffs. Unlike in *Cybergenics I*, therefore, the sale here included a much broader range of

assets: assets owned by Debtor, assets of the Estate and Trustee's interests in those assets.

But, as the Agreement is multi-faceted, it also does more. It settles the New York Action by

dismissal. And, it also specifically authorizes Plaintiffs to bring the claims that were

conveyed "on behalf of the bankruptcy Estate" with any net recoveries to be property of the

estate and distributed in accordance with the Bankruptcy Code.

At the sale hearing, I did not deconstruct the Agreement—in either my analysis, my

approval or the Order. Plaintiffs did not seek separate rulings on the different aspects of the

Agreement, nor did Defendants suggest that different standards should be used for each

component. Rather, I approved the Agreement as a whole using a § 363 sale standard. This

is not surprising given (i) the requirement in the Agreement that approval be sought under

---

[106] *Id.* at 568-69.
[107] *Id.* at 572.

§ 363, (ii) the focus on the auction process and (iii) the single, unallocated, consideration paid by the purchaser under the Agreement.

### (a) On the Briefing in this Case, I Will Not Decide Whether the Avoidance Actions are Property of the Estate or Whether they Can be Sold.

Contrary to Defendants' position, the Third Circuit has not determined whether avoidance actions are property of the estate or whether such claims or a trustee's right to pursue avoidance actions can be sold. As set forth above, *Cybergenics I* did not decide either of these matters as the agreement at issue did not purport to sell either. But, in *dicta*, the Court does posit that if property of the estate were at issue, the Court would not change its conclusion.[108] The Court recognized that, with a few exceptions, property of the estate contains only a debtor's interest in property as of the bankruptcy filing.[109] Citing to § 541, the Court also recognized that "property of the estate" is a term of art under the Bankruptcy Code. Thus, if the question were squarely before it, it is certainly possible that the Third Circuit might conclude that state-law based avoidance actions[110] are not property of the estate, though that might not answer the question whether avoidance actions, or some aspect of them, may be sold.[111]

But, neither Plaintiffs nor Defendants did an analysis under § 541 or § 363, or any other provision of the Bankruptcy Code to determine whether avoidance actions are

---

[108] *Cybergenics I*, 226 F.3d at 246 n.16. The Court also observed the nature of avoidance powers as "statutorily created powers" created to enable a trustee or debtor-in-possession to fulfill its duty to recover property on behalf of the estate. *Id.* at 243. And, the Court referred to avoidance powers as an "attribute." *Id.* at 244.

[109] *Id.* at 245-46.

[110] *Cybergenics I* did not involve federal-law based avoidance actions.

[111] For example, in *Cybergenics I*, the Third Circuit referenced Ninth Circuit cases that addressed either an express assignment of avoidance powers to third parties or concluded that § 544(b) powers were transferrable to a creditor who purchased the estate's right to certain sale proceeds. *Cybergenics I*, 226 F.3d at 244-45 (citing *Briggs v. Kent (In re Prof'l Inv. Props. of Am.)*, 955 F.2d 623 (9th Cir. 1992) (The court in *Briggs* concluded that "if a creditor is pursuing interests common to all creditors or is

property of the estate, or whether they may be sold. Nor did either party discuss any

potential differences between state-law based claims and federal-law based claims or

consider whether a trustee can sell whatever he may have of value even if it is not property

of the estate.[112]  Plaintiffs simply pointed out that *Cybergenics I* did not determine the issue,

without addressing statements made in *dicta*. And, Plaintiffs stated in a conclusory fashion

that nothing in the Bankruptcy Code prohibits the sale of avoidance actions. In these

circumstances, without any real assistance from any party on these issues—much less any

thoughtful analysis—I hesitate to rule on an issue which the Third Circuit on appeal in this

case stated does not have an "obvious answer."[113]  Fortunately, I do not need to. Plaintiffs

have standing to bring the Avoidance Actions because I authorized them to do so in the

Sale Order.

---

appointed for the purposes of enforcement of the plan, he may exercise the trustee's avoidance
powers."); *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774 (9th Cir. 1999)
(the court applied *Brigg's* holding in the chapter 7 context)). The Third Circuit did not indicate
agreement or disagreement with these cases. Similarly, in further *dicta*, the Third Circuit stated that
while a § 544(b) fraudulent transfer action itself would not be property of estate, it noted a distinction
between the cause of action and (i) the "'equitable interest' that some courts have said may be
retained by a debtor in fraudulently-transferred property" as well as (ii) avoidance powers. *Id.* at 246
n.16. The Court did not comment on what a trustee might do with this equitable interest or its
avoidance powers.

[112] *See generally In re Ames Dep't Stores, Inc.*, 287 B.R. 112 (Bankr. S.D.N.Y. 2002) (in context of sale
of designation rights discussing, among other things, statutory language, the nature the rights, non-
bankruptcy law concepts of property; also pondering whether § 363 should be a constraint if the
estate can secure value for the benefit of creditors that does not involve estate property).

[113] *In re Pursuit Capital Mgmt., LLC*, 874 F.3d at 134. *See also Cedar Rapids Lodge & Suites, LLC v.
Seibert*, No: 14–CV–04839 SRN/KMM, 2018 WL 747408 (D. Minn. Feb. 7, 2018) (observing that
courts differ over whether fraudulent transfer actions are property of the estate as well as whether
such claims can be transferred; also observing that many decisions do not distinguish between state-
law based fraudulent transfers and federally created avoidance actions) (collecting cases); *see also
Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253 (5th Cir. 2010) (concluding that state-based fraudulent
transfer claims are either property of the estate under § 541(a)(1) or, alternatively, become property
of the estate as successor rights under § 544(b)); *see generally* Harris Winsberg and Michele J. Kim,
*Unlocking Value: Can a Trustee Sell Avoidance Claims Grounded in Sections 544(B), 547 or 548 of the
Bankruptcy Code*, 22 J. BANKR. L. & PRAC. 2 ART. 2 (2013).

### (b) Derivative Standing Can Be Extended to Chapter 7 Cases

The import of *Cybergenics II* is that *Hartford Underwriters* is not a per se constraint on the ability of a nontrustee to act in instances where the Bankruptcy Code identifies the trustee as the actor as long as the nontrustee does not act unilaterally. *Cybergenics II* recognizes the ability of the court to permit a third party to employ the trustee's avoidance powers in appropriate circumstances, i.e. when the Code's envisioned scheme has broken down. Plaintiffs contend such circumstances exist here.[114] Defendants contend that *Cybergenics II* either cannot, or should not, be applied in a chapter 7 case.[115]

I conclude that *Cybergenics II* can be extended to cases under chapter 7 and that individual creditors may be permitted to assert avoidance actions in appropriate circumstances with court approval. While the Third Circuit has not yet applied its *Cybergenics II* rationale to other chapters, I find it equally applicable to chapter 7. First,

---

[114] Plaintiffs hesitate to invoke derivative standing concepts because they believe there is an outright sale of the avoidance actions. But, Plaintiffs contend they meet the requirements for derivative standing. Plaintiffs' First Supplemental Brief; Plaintiffs' Second Supplemental Brief.

[115] Defendants cite *Weyandt v. Fed. Home Loan Mortg. Corp. (In re Weyandt)*, 544 Fed. App'x 107 (3d Cir. 2013) and *Knapper v. Bankers Trust Co. (In re Knapper)*, 407 F.3d 573 (3d Cir. 2005) in support of their position. These cases are narrow rulings and are of limited persuasive value outside of their exact factual circumstances, as the opinions make clear. *See In re Weyandt*, 544 Fed. App'x 107, 110 ("At this time we do not take a position on whether derivative standing may be appropriate in some Chapter 13 contexts, an issue Weyandt acknowledges in her brief is an unsettled one. We note, however, that the question of whether such an extension is appropriate would require an in-depth examination of the form and purpose of Chapter 13 bankruptcies, which Weyandt has not provided. Instead we hold that even assuming derivative standing may be available in some Chapter 13 bankruptcies, Weyandt cannot prevail because she has not shown that a grant of derivative standing would be appropriate *under the facts and circumstances of this case*.") (emphasis added); *In re Knapper*, 407 F.3d 573, 583 ("Knapper is not the trustee, she is the debtor. As we have mentioned, although the caption of Knapper's complaint lists the standing Chapter 13 trustee as a plaintiff, he did not participate in her adversary proceeding in any way. Section 544(b)(1) plainly gives the trustee the power to avoid certain transfers, however, Knapper has offered no authority to establish that it also confers that right upon the debtor *under the circumstances here*.") (emphasis added) (citation omitted).

32

§ 503(b)(3)(B) applies in chapter 7.[116] Second, the Third Circuit ruled that the "most natural

reading of § 503(b)(3)(B) is that it recognizes and rewards monetarily the practice of

permitting creditors' committees, with court authorization, to pursue derivative actions."[117]

As the language in the statute, however, references only "creditors," not creditors'

committees, an even more natural reading of § 503(b)(3)(B) is that it recognizes and rewards

permitting actual creditors—the parties the statute explicitly mentions—with court

authorization to pursue derivative actions. The Third Circuit recognizes this even more

natural reading when they describe themselves as "realists" noting that if the court does not

sanction suits by creditors' committees, "individual creditors could simply substitute

themselves as plaintiffs under Fed. R. Civ. P. 17(a)" and continue the litigation.[118]

Third, the court's equitable powers, recognized by *Cybergenics II*, exist in the chapter

7 context. As the Third Circuit stated, in enacting § 544, Congress expressed its intention

that state-law based fraudulent conveyances be recovered in order to maximize the value of

the estate.[119] The same policy underlies federally-based fraudulent transfer actions under

§ 548 as this provision incorporates the law of fraudulent transfer into the Bankruptcy

Code.[120] In both §§ 544 and 548, the power and duty to bring fraudulent transfer actions is

vested in a trustee.[121] When a trustee refuses to bring the action, the bankruptcy court can

---

[116] 11 U.S.C. § 103(a).

[117] *Cybergenics II*, 330 F.3d at 564.

[118] *Id.* at 566. *See also Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source Inc.)*, 555 F.3d 231 (6th Cir. 2009) (relying on § 503(b)(3)(B) the court ruled that an individual creditor may pursue a derivative action in a chapter 7 case).

[119] *Cybergenics II*, 330 F.3d at 568-69.

[120] 5 *Collier on Bankruptcy* ¶ 548.01 (16th ed. 2016); *see Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 81 (D. Del. 2001) ("Fraudulent conveyance laws, such as the Bankruptcy Code . . . are intended to prevent shareholders, secured creditors, and others from benefitting at the expense of others, including unsecured creditors.").

[121] *Cybergenics II*, 330 F.3d at 568.

33

invoke its equitable powers to effect the result the Bankruptcy Code was designed to obtain even if the remedy was not directly authorized by the Bankruptcy Code.[122] There is simply no basis in the Bankruptcy Code for interpreting § 503(b)(3)(B), § 544 or § 548 differently in the chapter 7 context.[123]

Fourth, the public policy concerns underlying chapter 7 are consistent with the use of the court's equitable powers.  Two primary goals of the Bankruptcy Code are to maximize the value of the estate for the benefit of creditors and to provide for the equality of treatment of creditors.[124]  In a corporate chapter 7 case, such as this one, it is hard to imagine other, or at least any more important goals.[125]  While a chapter 7 trustee is to close a case "expeditiously" the expedition is qualified "as is compatible with the best interests of all parties in interest."[126]  Where there are fraudulent conveyance actions to be brought, the expeditious closing of the estate can take a back seat to potential recoveries.

The Sixth Circuit has expressly recognized that it is appropriate for the court to use its equitable power to permit a nontrustee to prosecute avoidance actions in chapter 7 cases. In *In re Trailer Source*,[127] the Sixth Circuit determined that derivative standing was available for creditors in a chapter 7 case based on *Cybergenics II*'s § 503(b)(3)(B) analysis.  The Sixth

---

[122] *Id.*

[123] *See* 11 U.S.C. § 103(a); *In re Trailer Source Inc.*, 555 F.3d at 243 ("[T]here is no textual support in the Code for drawing such a distinction [for the need for derivative standing] between the Chapter 7 and Chapter 11 contexts.").

[124] *In re Baker*, 503 B.R. 751, 755 (Bankr. M.D. Fla. 2013); *In re SemCrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009).

[125] Other chapters of the Bankruptcy Codes may have different and/or equally important goals.  For example, one goal of an individual chapter 7 case is to provide a fresh start to an honest, but unfortunate debtor, by way of the grant of a discharge.  *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007).  And, "[t]he primary goal of a Chapter 13 case is the completion and confirmation of a reorganization plan which provides payments to the debtor's creditors and a discharge of the debtor's debts."  *In re Rosenblum*, 545 B.R. 846, 862 (Bankr. E.D. Pa. 2016).

[126] 11 U.S.C. § 704(a)(1).

[127] *In re Trailer Source, Inc.*, 555 F.3d 231.

Circuit could find no textual support in the Code for drawing a distinction between the chapter 7 and chapter 11 contexts[128] and saw "substantial policy reasons for allowing derivative standing in Chapter 7 proceedings."[129]  In particular the court noted that, as here (and, in contrast to chapter 11 cases), chapter 7 cases often have no liquid assets, consequently, chapter 7 trustees decline to pursue meritorious and/or sizeable claims simply because there are no funds to pursue them.  In these instances, the fundamental bankruptcy goal of maximizing the estate, and thus recoveries for creditors, is jeopardized.  Indeed, "[j]ust as conflicts of interest may lead to underenforcement of avoidance claims by debtors-in-possession in Chapter 11 proceedings, a lack of available funds may lead to underenforcement by trustees in Chapter 7 proceedings."[130]  Other courts have similarly extended *Cybergenics II* to both chapter 7 and chapter 13 cases.[131]

Certain courts have rejected creditors' attempts to bring avoidance claims in chapter 7 cases.[132]  One of the most extensive opinions, and the one on which Defendants heavily

---

[128] *Id.* at 243.

[129] *Id.* at 243–44.

[130] *Id.* at 244.

[131] *See In re Rosenblum*, 545 B.R. 846 (analyzing *Cybergenics II* and granting derivative standing to a creditor in a chapter 13 case); *PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892 (8th Cir. 2008) (concluding that derivative standing is available to a creditor in chapter 7 case); *In re Rim*, Civ. No. 10-1066 (DMC), 2010 WL 4615174, at * 2 (D.N.J. Nov. 3, 2010) ("While the Third Circuit has not addressed derivative standing for Chapter 7 creditors, other courts have permitted individual creditors to bring derivative avoidance actions where the Trustee has declined to do so."); *In re Sandenhill, Inc.*, 304 B.R. 692, 694 (E.D. Pa. 2004) (although *Cybergenics* was a chapter 11 case, "we frankly cannot imagine that the Third Circuit would employ a different rationale in a Chapter 7 matter").

[132] *Miller v. Stone (In re Waterford Funding, LLC)*, Bankr. No. 09–22584, Adv. No. 11–2093, 2017 WL 439308, at *2-3 (Bankr. D. Utah Feb. 1, 2017) (holding that trustee was "legally precluded from" assigning claims under § 544(b) and § 548); *In re Clements Mfg. Liquidation Co.*, 558 B.R. 187, 189 (Bankr. E.D. Mich. 2016) ("The Court therefore holds that the Chapter 7 trustee in this case may not assign any of the avoidance actions/powers as he seeks to do in the proposed settlement."); *In re Carragher*, 249 B.R. 817, 820 (Bankr. N.D. Ga. 2000) ("Absent extraordinary circumstances, a trustee is prohibited from selling, transferring, or assigning the right to assert and maintain an estate's avoidance action to an individual creditor.").

rely, is *In re Cooper*,[133] which examines the issue of derivative standing from a distinctly

different, and somewhat unusual posture. In *In re Cooper*, Mr. and Mrs. Cooper filed an

individual chapter 7 case and a trustee was appointed. The chapter 7 trustee and a large,

unsecured creditor, as joint plaintiffs, filed an adversary proceeding against Mr. Cooper

seeking to revoke his discharge, compel turnover of non-exempt assets and obtain a

judgment based on false representations. Subsequently, the chapter 7 trustee unilaterally

entered into a settlement with the debtors to which the creditor/plaintiff objected, arguing

that the chapter 7 trustee should not be able to settle the entire case because the

creditor/plaintiff could have brought its own motion to revoke Mr. Cooper's discharge.

While the bankruptcy court approved the settlement, on appeal the district court affirmed

the trustee's settlement with the debtor, but reversed the portion of the ruling forcing the

creditor/plaintiff to dismiss its revocation request. Left on remand with only half a loaf, the

settlement fell apart. Thereafter, the creditor/plaintiff asked for "authority to prosecute *all*

of the causes of action in the Trustee's stead."[134] The trustee objected. As the court put it:

"the Trustee opposed the somewhat forced abdication of her responsibilities and authority

as Trustee."[135]

The *Cooper* court rejects derivative standing in a chapter 7 case because it finds no

textual basis for derivative standing in any provision of the Bankruptcy Code applicable to

chapter 7.[136] Significantly, the *Cooper* court expressly rejects the *Cybergenics II* analysis of

---

[133] *Reed v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Tex. 2009).

[134] *Id.* at 806.

[135] *Id.* at 806-07. The court also noted that the creditor/plaintiff acquired its claim after the debtor was granted a discharge.

[136] The *Cooper* court does not definitively find a textual basis for derivative standing in chapter 11 cases, noting only that the textual basis in chapter 11 "would seem to be at least" §§ 1103(c)(5), 1109(b), and "most significantly" § 1123(b)(3)(B). To rely on these sections, however, would only appear to permit derivative standing pursuant to a confirmed plan.

§ 503(b)(3)(B) ruling instead that it does not explicitly or implicitly provide a basis to confer derivative standing to pursue avoidance actions.[137] The court also rejects derivative standing because of the role of independent trustees in chapter 7 cases. The *Cooper* court correctly notes that chapter 7 trustees do not have the potential conflicts of interest inherent in chapter 11 cases and it correctly notes that there are procedures in place for creditors to challenge the business judgment of a trustee. And, the *Cooper* court expresses concerns regarding the "hijacking" of a chapter 7 bankruptcy case by a non-statutory fiduciary and the potential it has to run afoul of the fresh start policy for individual debtors. The court concludes that it is not good policy to usurp the trustee's role in a chapter 7 case.

---

[137] *Id.* at 813 n.15 ("On the topic of Section 503(b)(3), the court notes that some authority suggests that this statute is textual support for the notion that creditors may be given derivative standing to pursue estate actions in either Chapter 7 or 11. Section 503(b)(3) provides that 'a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor' may be entitled to an allowed administrative expense claim for the actual, necessary expenses incurred by it, and Section 503(b)(4) provides a mechanism for a possible administrative expense claim for an attorney for such a creditor. The *Cybergenics* court pondered this statute and decided that, while this statute did not provide an *express* statutory basis for a bankruptcy court conferring derivative standing on a creditor to pursue avoidance actions, the statute would be meaningless unless authority to give a creditor derivative standing somehow otherwise existed. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F. 3d 548, 567 (3d Cir. 2003) (*en banc.*) Other courts have pondered this statute and declined to hold that Section 503(b)(3)(B) implicitly confers standing on creditors to sue on behalf of the estate. *E.g.*, *Surf N Sun Apts., Inc. v. Dempsey*, 253 B. R. 490 (M.D. Fla.1999). This court does not believe that Section 503(b)(3)(B) should be interpreted to explicitly or implicitly confer standing on creditors to pursue avoidance or other estate causes action. There are various plausible explanations for Section 503(b)(3)(B) other than the situation of derivative litigation. *See K. Sharfman, Derivative Suits in Bankruptcy*, 10 STAN. J.L. BUS. & FIN. 1, 7-8 (Autumn 2004). Among other things, a creditor might bring a direct action of his own (for example, assume a creditor, after filing a motion to lift stay and obtaining permission of the bankruptcy court, brings a state conversion action for the wrongful transfer of the creditor's collateral; assume further he recovers the collateral and there is a surplus value for the estate; Section 503(b)(3)(B) would appear to allow the creditor to request an administrative expense claim for his efforts which benefitted the estate). *Id.* Another example is that a creditor could pursue discovery and investigations (with court permission) and ultimately recover property of the estate without even bringing any action. This would appear to be another example for the use of Section 503(b)(3)(B). *Id.*").

While I do not disagree with some of the observations made by the *Cooper* court, I part ways in some significant aspects. First, *Cybergenics II* is the law of the Circuit and provides the textual basis, together with the use of a court's equitable powers, for derivative standing. Second, the *Cooper* court does not fully account for the situation *sub judice*—a chapter 7 trustee who has determined it is in the best interest of the estate to sell and/or otherwise permit a creditor to prosecute a cause of action because he has no funds to do so. In no sense is this a hijacking of a bankruptcy case or a derogation of a chapter 7 trustee's fiduciary duty. Indeed, the trustee here is administering this asset by finding a way to monetize it; he was not neutral or absent, and did not object to the sale. Trustee held an auction, obtained a favorable price, and successfully defended the sale to the Third Circuit. No one is usurping his role. Third, the option that a creditor should fund the trustee's pursuit of the litigation is not always a viable option. Finally, and particularly with respect to state-law based fraudulent conveyance actions, creditors should not be left worse off in a chapter 7 scenario. As the *Cybergenics I* court held, outside of bankruptcy such actions belong to creditors. If a chapter 7 trustee has no funds to pursue such an action and a creditor is willing to do so, the bankruptcy court should be able to determine, on a case-by-case basis, whether to permit it. Here, Trustee did his job and asked the court to approve the Agreement.

In *Cybergenics II*, the Third Circuit noted that fraudulent transfers present "a particularly vexing problem" in chapter 11 cases, but the court did not discount their importance in chapter 7 cases. While acknowledging the conflict of interest concerns in chapter 11 cases where a debtor-in-possession remains in management, the court also recognized the concern of a debtor-in-possession too weak financially to advocate for itself.

In each of these situations, the Third Circuit observed that "the real losers are the unsecured creditors whose interests avoidance actions are designed to protect."[138]  I conclude that fraudulent transfers in a corporate chapter 7 case also present a particularly vexing problem. In instances, such as this one, where a debtor's prepetition corporate management is alleged to have engaged in fraudulent transfers immediately prior to the bankruptcy filing, stripping the debtor of any funds that a chapter 7 trustee could use to make distributions to those creditors and/or to investigate management's actions, the intended system has broken down, and it is appropriate for the bankruptcy court to use its equitable powers and craft a flexible remedy.  In such instances, the court may substitute itself as the gatekeeper with respect to the prosecution of avoidance actions in order to benefit the estate and in furtherance of bankruptcy goals.

### (c) The Sale Order Granted Plaintiffs Derivative Standing; Alternatively, Derivative Standing is Granted, *Nunc Pro Tunc,* to the Commencement of the Adversary Proceeding

Having determined that derivative standing may be extended to chapter 7 cases, a question remains: did my prior approval of Plaintiff's prosecution of the Avoidance Actions employ a permissible standard?  In *Cybergenics II,* the Third Circuit did not establish procedures the bankruptcy court should follow to allow a creditor to sue derivatively, but as part of its textual analysis the Court cited to cases in the Second Circuit and Seventh

---

[138] *Cybergenics II,* 330 F.3d at 573.

Circuit.[139] The Court cited *In re Commodore Int'l Ltd.*[140] for the Second Circuit's requirements

for derivative standing:

> [W]e hold that a creditors' committee may sue on behalf of the
> debtors, with the approval and supervision of a bankruptcy
> court, not only where the debtor in possession unreasonably
> fails to bring suit on its claims, but also where the trustee or the
> debtor in possession consents.[141]

And, the Court cited *Fogel v. Zell*[142] for the Seventh Circuit's requirements for derivative

standing:

> If a trustee unjustifiably refuses a demand to bring an action to
> enforce a colorable claim of a creditor, the creditor may obtain
> the permission of the bankruptcy court to bring the action in
> place of, and in the name of, the trustee . . . . In such a suit, the
> creditor corresponds to the shareholder, and the trustee to
> management, in a shareholder derivative action.[143]

As is evident, these standards are not identical and the *Commodore* requirement is a lesser

standard than the *Fogel* requirement.[144]

My approval of the Agreement using the § 363 standard clearly meets the *Commodore*

standard for derivative standing. In using the § 363 standard I concluded that a sound

business judgment existed for the sale, there was fair notice, and the purchaser acted in good

faith. As part of my ruling, I also concluded that Trustee's entry into the Agreement was a

---

[139] *Cybergenics II*, 330 F.3d at 566-67; *Official Comm. of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, No. 01–11353 (PJW), ADV. 02–04553, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003); *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141 (D. Del. 2004) (citing *In re Valley Media, Inc.*, 2003 WL 21956410). Our independent research did not turn up a Third Circuit decision since *Cybergenics II* establishing a standard for derivative standing.
[140] *In re Commodore Int'l Ltd.*, 262 F.3d 96 (2d Cir. 2001).
[141] *Cybergenics II*, 330 F.3d at 566 (quoting *In re Commodore Int'l Ltd.*, 262 F.3d at 100).
[142] *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000).
[143] *Cybergenics II*, 330 F.3d at 566-67 (quoting *Fogel v. Zell*, 221 F.3d at 966).
[144] *In re Valley Media, Inc.*, 2003 WL 21956410, at *2 ("The Second Circuit requirement is obviously a lessor requirement, but *Cybergenics II* did not expressly adopt it. Instead it suggests a creditors committee can be granted derivative standing when the trustee is 'delinquent' in pursuing action on behalf of the estate.").

sound exercise of his business judgment. My ruling as well as the evidence to support it clearly reflects the Trustee's consent. And, as the Sale Order provides that any settlement of the Avoidance Claims will be submitted to the bankruptcy court for approval under a Rule 9019 standard, some measure of court supervision was maintained over the prosecution of the action. Because the *Commodore* requirements for derivative standing were met as part of the approval of the Agreement, the effect of the entry of the Sale Order under the *Commodore* standard was to grant Plaintiffs derivative standing.

My approval of the Agreement using the § 363 standard, however, did not require me to consider if the claim to be prosecuted is "colorable," as required under the *Fogel* standard. In this aspect, the *Fogel* standard comports closely with the three-part test for derivative standing generally employed by district courts and bankruptcy judges within the Third Circuit. This test asks whether: "(i) the [trustee] has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the [estate]; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court."[145] As part of my approval of the Agreement, I did not expressly rule one way or the other on the colorability of the Avoidance Actions. But, to the extent I used an incorrect standard for approval, on the facts and in the posture of this case, I can correct that now by granting Plaintiffs derivative standing *nunc pro tunc* to the commencement date of this adversary proceeding.[146]

---

[145] *In re Optim Energy, LLC*, No. 14–10262 (BLS), 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014) (citing *Cybergenics II*).

[146] The requirement that a bankruptcy court approve derivative standing prior to the filing of a derivative claim effectuates the bankruptcy court's role as gatekeeper with respect to derivative standing actions. *In re Nat'l Forge Co.*, 326 B.R. 532, 554 (W.D. Pa. 2005); *In re Rosenblum*, 545 B.R. at 871–72. But this is not a *per se* rule. Standing may be granted retroactively after considering "the underlying policy objectives." *In re Nat'l Forge Co.*, 326 B.R. at 546. Although the Third Circuit has not considered *nunc pro tunc* approval in this context, the factors-based analysis in *In re National Forge*

The first prong of the derivative standing standard is met because Trustee consented to Plaintiffs' prosecution of the Avoidance Actions. The third prong of the standard is met because Plaintiffs have received permission from the court to sue. This leaves only the second prong of the standard—whether the Avoidance Actions are colorable.

A claim is colorable if it would survive a motion to dismiss.[147] Defendants have supplied the answer to this question; they did not bring a motion to dismiss the Avoidance Actions for failure to state a claim. Defendants have filed four briefs in support of this Motion to Dismiss as well as several letter submissions and nowhere in any of these filings did they move to dismiss the Avoidance Actions for failure to state a claim. Defendants

---

*Co.* has been adopted elsewhere. *See, e.g., In re Racing Servs., Inc.*, 540 F.3d at 904 (rejecting a per se rule forbidding retroactive granting of derivative standing and noting "the practice of numerous federal courts granting creditors retroactive permission); *In re Rosenblum*, 545 B.R. at 871–72 (granting creditors derivative standing to pursue fraudulent conveyance action in state court *nunc pro tunc* on motion to hold bankruptcy case in abeyance pending outcome of state court litigation); *see also In re Yes! Entm't Corp.*, 316 B.R. at 145–46 (reversing bankruptcy court decision dismissing case for lack of standing, and, on appeal, finding derivative standing appropriate); *In re Valley Media, Inc.*, 2003 WL 21956410, at *3 (denying motion for summary judgment for lack of standing, and, instead, approving derivative standing *nunc pro tunc*, and giving significant weight to the debtor's consent); *but see Scott v. Nat'l Century Fin. Enters., Inc. (In re Balt. Emergency Servs. II, Corp.)*, 432 F.3d 557, 563 (4th Cir. 2005) (rejecting retroactive derivative standing without deciding whether derivative suits are permitted). The *National Forge* factors are not exhaustive and not all of them will apply in a given case. *See In re Nat'l Forge Co.*, 326 B.R. at 556 n.11. Here, all, if not substantially all of the factors are met: (i) I would have granted derivative standing in the first instance had the motion specifically requested that relief; (ii) retroactive approval does not create any confusion or compromise the efficient administration of the estate as prosecution of the claims is the exact relief Trustee sought by the Sale Motion; (iii) Plaintiffs sought approval to bring the Avoidance Actions so there was no delay in seeking court approval; (iv) retroactive approval does not unfairly prejudice Defendants as they were aware Plaintiffs sought to bring the claims and participated in the auction seeking to purchase the claims themselves; (v) retroactive approval will not encourage laxity on the party of creditors or encourage disregard of prior approval because prior approval was sought, and (vi) the "overriding principles of fairness require an examination of the [P]laintiff[s'] claims" as Plaintiffs seek redress against insiders for allegedly stripping assets from Debtor at the expense of its creditors. *See id.* at 556.

[147] *In re Optim Energy, LLC*, 2014 WL 1924908, at *6 ("'In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim.' The motion to dismiss standard is well known: '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (citation omitted).

moved to dismiss the Complaint on no less than eleven separate grounds, including that

"Plaintiffs have failed to plead a cause of action for Unjust Enrichment and Count IX must

be dismissed" and "The Plaintiffs' Aiding and Abetting Claim fails to State a Claim."[148] If

the Avoidance Actions were susceptible to a motion to dismiss for failure to state a claim,

Defendants would have moved on those grounds.

Moreover, based on the allegations in Counts I-III, it is easy to conclude the claims

are colorable. Plaintiffs allege, among other things, that in violation of representations

made by counsel for Defendants, incentive fees owing to Debtor were transferred from the

Capital Fund to Debtor and then into the personal accounts of Schepis and Mr. and Mrs.

Canelas, and the transfers were made in secret, for no consideration and for no valid

purpose.[149] Plaintiffs also allege that Debtor's contractual right to the carried interest was

improperly transferred to Northeast Management Corporation in exchange for no

consideration when Schepis and Canelas withdrew Debtor as the general partner of each

Feeder Fund and installed Northeast Management Corporation as the successor general

partner.[150] For purposes of a motion to dismiss, the allegations in the Complaint sufficiently

detail valid causes of action. Plaintiffs have, therefore, met the test for derivative standing.

In hindsight, it may have been better to have judged the Agreement under three

standards: the § 363 standard with respect to the sale of the non-avoidance causes of

action,[151] the Bankruptcy Rule 9019 standard with respect to the dismissal of the New York

---

[148] Defendants' Opening Brief 29-31.

[149] Complaint ¶¶ 41-49.

[150] Complaint ¶¶ 61-67.

[151] The non-Avoidance Claims are property of the estate and may be sold under § 363. *See* 5 *Collier on Bankruptcy* ¶ 541.07 (16th ed. 2016) ("The estate created pursuant to section 541(a) includes causes of action belonging to the debtor at the time the case is commenced."); *See Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir.1997) ("The Bankruptcy Code defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles and causes of

Action,[152] and the derivative standing standard with respect to the Avoidance Actions.[153] Nonetheless, by the Sale Order, I gave Plaintiffs permission to bring the Avoidance Claims on behalf of the bankruptcy estate, with the net recoveries to be property of the estate and distributed in accordance with the priorities established by the Bankruptcy Code. And, to the extent necessary, I have now specifically granted Plaintiffs permission to proceed derivatively on the Avoidance Actions. The Motion to Dismiss on these grounds is denied.

### C. The Doctrine of Champerty Does Not Deprive Plaintiffs of Standing

In the Supplemental Briefing, Defendants raise for the first time the doctrine of champerty as a reason why Plaintiffs cannot prosecute each of the claims asserted in the Complaint.[154] "The doctrine of champerty 'is based upon the ground that no encouragement should be given to litigation by the introduction of a party to enforce those rights which the owners are not *disposed to prosecute.*'"[155] In Delaware, the doctrine of champerty invalidates agreements "between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense."[156] The doctrine only applies to "volunteers" or "strangers"—"those who have no legal interest in the subject matter of the

---

action."); *First Fidelity Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 426 (3d Cir. 1995) (section 363(c)(1) allows a trustee to sell property of the estate); *In re Hudson Valley Ambulance Serv., Inc.*, 11 B.R. 860, 864 (Bankr. S.D.N.Y. 1981) ("As long as the property in question is deemed 'property of the estate' the debtor is given [a] right 'to use, sell or lease property of the estate' under Code s 363."). Here, these claims were sold subject to certain contractual limitations.
[152] This is the standard for a settlement of a claim.
[153] Harris Winsberg and Michele J. Kim, *supra* note 115 (discussing the various standards depending on the context in which avoidance actions are being considered: sale, settlement or a request for derivative standing as well as whether claim is being pursued (or not), and for whose benefit).
[154] Defendants' First Supplemental Brief 13–15.
[155] *Charge Injection Techs., Inc. v. E.I. DuPont De Nemours & Co.*, C.A. No. N07C-12-134-JRJ, 2016 WL 937400, at *4 & n.43 (Del. Super. Ct. Mar. 9, 2016) (quoting *Gibson v. Gillespie*, 152 A. 589, 593 (Del. Super. Ct. 1928)).
[156] *Hall v. Delaware*, 655 A.2d 827, 829 (Del. Super. Ct. 1994) (citation omitted).

dispute; those who have no relation to either of the parties to the dispute . . . ."[157]
Agreements are not champertous when "the assignee has some legal or equitable interest in
the subject matter of the litigation *independent from* the terms of the assignment under which
the suit was brought."[158] The standard by which courts judge an assignee's preexisting legal
or equitable interest is a "low threshold."[159] The doctrine's purpose is to keep "strangers"
from perpetuating litigation.[160]

    Defendants argue that the Agreement is champertous because Trustee "expressed
that he lacks the wherewithal and is not disposed to bring the causes of action"[161] and
because Plaintiffs are, in the first instance, picking up the expense of the litigation. These
contentions, and Defendants' further contention that Trustee saw no benefit in pursuing
these claims, are belied by Trustee's actions. While Trustee did not have the funds to
pursue the lawsuit, he negotiated the Agreement, including a provision that 100% of the net
proceeds would come to the estate, and defended his process through two levels of appeal.
These are not the actions of a trustee who sees no benefit in pursuing the claims.

    Further, Plaintiffs are not strangers to these causes of action or to the parties
involved. Plaintiffs are creditors of Debtor whose claims at the moment are "deemed
allowed" as no objections to their proofs of claims have been filed.[162] As creditors with

---

[157] *Id.*

[158] *Id.*

[159] *Street Search Partners, L.P. v. Ricon Int'l, L.L.C.*, C.A. No. 04C-09-191-PLA, 2006 WL 1313859, at *4 n.17 (Del. Super. Ct. May 12, 2006) (citing *Drake v. Nw. Natural Gas Co.*, 165 A.2d 452 (Del. Ch. 1960)).

[160] *See Hall*, 655 A.2d at 829.

[161] Defendants' First Supplemental Brief 14. The only cite for this assertion is to page 4 of the Settlement Agreement. Presumably, it is to the WHEREAS clause that states "the Estate currently has no funds with which to administer the Estate, let alone pursue the claims and litigation referenced hereinabove . . . ." Main D.I. 190 Ex. A, at 4.

[162] *See* 11 U.S.C. § 502(a).

allowed claims, they are entitled to a distribution from the estate, and the estate will be the ultimate recipient of any litigation proceeds from this adversary proceeding. It is thus far from accurate to characterize Plaintiffs as strangers to the parties of the litigation.[163]

Moreover, as discussed above, § 503(b)(3)(B) of the Bankruptcy Code independently authorizes recovery of expenses should Plaintiffs recover "property transferred or concealed by the debtor." Congress contemplated that creditors would be engaged in litigation seeking to recover on debtor's claims. Congress's decision to explicitly approve recovery of expenses for such an action is an indication that Plaintiffs, as creditors of the estate, are not strangers to the subject matter of this litigation.

The Motion to Dismiss because the Agreement is champertous is denied.

## II. The Limited Partnership Agreements Compel Arbitration of Claims IV-X Against the Feeder Funds and Northeast Capital Management

Defendants request that I dismiss this case in favor of arbitration, or that any non-arbitrable claims be stayed pending arbitration.[164] "Arbitration is a matter of contract between the parties."[165] The Federal Arbitration Act provides that "[a] written provision" in a contract showing an agreement to settle disputes by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[166] To stay a suit in favor of arbitration, there must be "an agreement in

---

[163] *See generally Southeastern Chester Cnty. Refuse Auth. v. BFI Waste Servs. of Penn., LLC*, No. K14C–06–016 JJC, 2017 WL 2799160, at * 8 (Del. Super. June 27, 2017) (assignment of claim to judgment creditor of assignor is not champertous because judgment creditor has right to execute on whatever assignor may receive on claim).

[164] Defendants' Opening Brief 17–24.

[165] *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)).

[166] 9 U.S.C. § 2.

writing"[167] requiring arbitration, and courts must be "satisfied that the making of the

agreement for arbitration . . . is not in issue" before ordering arbitration.[168]

If the complaint, and the documents it relies on, make clear that a party's claims "are

subject to an enforceable arbitration clause, a motion to compel arbitration should be

considered under a Rule 12(b)(6) standard without discovery's delay."[169] By contrast, "if the

complaint and its supporting documents are unclear [about] the agreement to arbitrate, or if

the plaintiff has responded to a motion to compel arbitration with additional facts sufficient

to place the agreement to arbitrate in issue, then 'the parties [are] entitled to discovery . . .

[and] further briefing'" on arbitrability.[170]

Here, the Complaint does not refer to or attach an arbitration agreement nonetheless,

the Complaint invokes specific provisions of and duties created by the limited partnership

agreements that govern the Capital Fund and the Opportunity Fund.[171] To support their

---

[167] § 3.

[168] § 4.

[169] *Guidotti*, 716 F.3d at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

[170] *Id.* After such limited discovery, a renewed motion to compel arbitration is reviewed under a summary judgment standard. *Id.* If there is a genuine dispute about the enforceability of the arbitration clause and summary judgment is not warranted, the "court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same . . . .'" *Id.*

[171] Complaint at ¶ 14 ("The Capital Fund is comprised of limited partner investors and a controlling general partner who was entitled to twenty percent (20%) of profits pursuant to Section 4.02(a) of the Limited Partnership Agreement (the 'Capital Partnership Agreement') and to a management fee of one and a half percent (1.5%) of assets under management pursuant to Section 6.04 of the Capital Partnership Agreement. The Debtor was general partner of the Capital Fund until shortly before the Debtor filed for bankruptcy."); *id.* ¶¶ 26–27 ("The Capital Fund was governed by an Amended Limited Partnership Agreement (the 'Capital Partnership Agreement') entered into between limited partners of the Capital Fund and the Pursuit General Partner . . . . The Opportunity Fund was governed by a Limited Partnership Agreement (the 'Opportunity Partnership Agreement') entered into between limited partners of the Opportunity Fund and the Pursuit General Partner."); *id.* ¶¶ 123–125 ("As set forth above, the Debtor as general partner of the Feeder Funds was contractually entitled to carried interest and fees in its role as general partner. Debtor's rights to carried interest and fees were governed by the Limited Partnership Agreements for the Feeder Funds and other documents. In violation of those Limited Partnership Agreements, the Pursuit Hedge Fund has

position, Defendants submitted two limited partnership agreements and declared each to be

a true and correct copy thereof: the Capital Fund LPA[172] and the Opportunity Fund LPA.[173]

Each limited partnership agreement provides:

> Any controversy between the partnership and any partner or
> between any party hereto arising out of or relating to this
> agreement or the breach thereof shall be settled exclusively by
> arbitration in accordance with the rules then in effect of the
> commercial division of the American Arbitration Association.
> The venue of such arbitration shall be New York, New York.[174]

The limited partnerships agreements are unsigned.[175] Debtor, as General Partner, did not

sign on the signature lines indicated for it on either agreement; neither did Defendants

supply any signature pages for any limited partners of either partnership. Further, neither

partnership agreement specifically states that the partnership is a party.

Plaintiffs maintain that the arbitration provisions are not applicable because none of

Defendants are parties to the limited partnership agreements and thus cannot invoke the

arbitration clauses.[176] Alternatively, Plaintiffs argue that the fraudulent conveyance counts

---

failed to distribute any proceeds from the UBS Action to the Debtor."). As the Third Circuit has ruled, if a complaint is based on an extrinsic document it is appropriate for me to consider that document on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Plaintiffs did not argue that the limited partnership agreements provided by Defendants were not the relevant limited partnership agreements, nor did they press the issue that documents provided by defendants are generally outside the scope of proper consideration at the motion to dismiss phase.

[172] Pursuit Capital Management Fund I, L.P. Amended and Restated Limited Partnership Agreement ("Capital Fund LPA"), Brogan Declaration Ex. A.

[173] Pursuit Opportunity Fund I, L.P. Limited Partnership Agreement ("Opportunity Fund LPA"), Brogan Declaration Ex. B.

[174] Capital Fund LPA Section 13.04, Brogan Declaration Ex. A, at 30; Opportunity Fund LPA Section 14.04, Brogan Declaration Ex. B, at 29.

[175] While the limited partnership agreements are unsigned, Plaintiffs did not argue that they were not true and correct copies. Nor did Plaintiffs submit different versions of the limited partnership agreements nor state that they needed discovery to obtain the agreements.

[176] Plaintiffs' Answering Brief 16. Plaintiffs do not argue that Debtor is not a party to the limited partnership agreements or that Plaintiffs, themselves, are not parties to the limited partnership agreements. Neither do Plaintiffs argue that the sale of the causes of action prevents Defendants from raising defenses that could be raised against Debtor.

are not subject to arbitration. Defendants counter that at least the partnerships themselves, and perhaps Mr. Schepis and Mr. Canelas are parties to the limited partnership agreements.[177] Defendants then argue that by virtue of Plaintiff's unitary enterprise characterization of all Defendants, that the arbitration provision should cover all defendants.[178] Defendants also argue that the court in the Southern District of New York action ("SDNY Action") "easily applied the arbitration clause to the similar allegations made in a similar case" and thus I should do the same here.[179]

Plaintiffs' argument that no Defendant is a party to one of the limited partnership agreements is incorrect. Under Delaware law, "a limited partnership is not required to execute its partnership agreement."[180] And "[a] limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement."[181] Thus, Defendant Capital Fund is a party to the Capital Fund LPA, and Defendant Opportunity Fund is a party to the Opportunity Fund LPA. Further, Debtor, as the general partner of each of these limited partnerships, is expressly a party to each of the Capital Fund LPA and Opportunity Fund LPA.[182] And, Defendant Northeast Capital

---

[177] Hr'g Tr. 32-34, Nov. 30, 2016.

[178] Defendants' Reply Brief 11.

[179] *Id.* at 19; Defendants' First Supplemental Brief 19–23; Defendants' Second Supplemental Brief 12–15. Defendants' theory of preclusion changes from their first brief to their last brief. In their Opening Brief, Defendants take the position that I should send the claims to arbitration. In their First Supplemental Brief, Defendants argue that because the SDNY Court sent the claims before it to arbitration, the doctrine of *res judicata* compels me to send the matter here to arbitration. In their Second Supplemental Brief, Defendants state (without citation to cases) that the relevant doctrine is judicial estoppel.

[180] DEL. CODE ANN. tit. 6 § 17-101(12).

[181] *Id.*; *see also In re El Paso Pipeline Partners, L.P.*, 132 A.3d 67, 95 (Del. Ch. 2015) ("By statute, both the partners and the limited partnership are parties to and bound by the limited partnership agreement, regardless of whether or not they sign it . . . ."), *rev'd on other grounds, El Paso Pipeline GP Co. v. Brinckerhoff,* 152 A.3d 1248 (Del. 2016).

[182] Capital Fund LPA at 1, Brogan Declaration Ex. A, at 1; Opportunity Fund LPA at 1, Brogan Declaration Ex. B, at 1.

Management, as the alleged successor general partner, is also a party to each limited partnership agreement.

But, Defendants' argument that the remainder of the Defendants should be able to enforce an arbitration provision in an agreement to which they are not expressly a party is unpersuasive. Defendants have not cited to any cases to support that position nor expressed a policy reason why that should be the case. The only argument they make is that Plaintiffs' allegations of unitary enterprise should be imported into this context. The merit of Plaintiffs' unitary enterprise theory is not before me at this phase of the litigation and neither party has fully addressed the theory's application to the facts of this case.[183]

As for the SDNY court's decision sending another lawsuit to arbitration, it is not *res judicata* for the simple reason that it is not a final judgment. In the SDNY Action, Plaintiffs, in their individual capacities, sued certain Defendants here, Schepis, Mr. and Mrs. Canelas and Northeast Capital. In their motion to dismiss in that case, the defendants argued, among other things, that the SDNY Action was barred by a previous arbitration proceeding. In an Opinion and Order issued in May 2016,[184] the SDNY court dismissed various counts and compelled "arbitration of the arbitrability of Defendants' *res judicata* defense." [185] The SDNY court then stayed the case pending resolution of the arbitration proceeding, hence the SDNY Action remains pending. Without a final judgment in the SDNY Action, *res judicata* is inapplicable.[186] As importantly, the SDNY court's analysis of the applicable

---

[183] Further, Defendants take exception to this categorization and point out that Plaintiffs have not asserted an alter ego or other veil piercing theories.

[184] Defendants' Reply Brief in Support of Motion to Dismiss Ex. A (No. 1:15-cv-04514-KPF).

[185] *Id.* at 25.

[186] *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015) ("[T]he general rule is that '[w]hen an issue of fact or law is actually litigated and determined by a valid and *final judgment*, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'") (citation omitted) (emphasis

arbitration provision, which appears to be the Capital Fund LPA, does not include an analysis of the parties bound by the provision.  In the Opinion and Order the relevant issue was who should decide the *res judicata* effect of the previous arbitration—the court or the arbitrator.  The parties bound by the arbitration provision was not the subject of the Opinion and Order.[187]

Having reviewed the arbitration provision and the parties bound by it, I conclude that Counts IV–X against Defendant Capital Fund, Defendant Opportunity Fund and Defendant Northeast Capital Management are subject to arbitration.  Counts IV-X are based on Debtor's prepetition state law claims acquired by Plaintiffs in the sale process.  According to Plaintiffs' Complaint, Debtor was the general partner of the Capital Fund and the Opportunity Fund.  The arbitration clauses in both limited partnership agreements mandate arbitration of "any controversy" between "the partnership" and "any partner" or between "any party" "arising out of or relating to" the limited partnership agreement or the breach of the agreement.  Debtor is both a party to each limited partnership agreement as well as a partner in each limited partnership.  Further, Plaintiffs did not argue that Counts IV–X are not within the scope of the arbitration provision.  Thus, based on the arbitration clause in the limited partnership agreements, I will grant the request to compel arbitration as

---

added); *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("A *final judgment* on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (emphasis added).

[187] The SDNY court recites that the initial motion filed in that case was a motion to dismiss or alternatively to compel arbitration.  Plaintiffs initially responded that the SDNY court should compel arbitration.  After some confusion and a call with the court, the parties were permitted to file revised papers.  The defendants' amended motion to dismiss did not contain an additional request for arbitration, but contained an argument that the lawsuit was precluded by a prior arbitration decision.  Defendants' Reply Brief in Support of Motion to Dismiss Ex. A, at 6-7, 21.  Plaintiffs then argued that the defense of *res judicata* should be submitted to arbitration for decision.  *Id.* at 21.

to Counts IV–X against the Capital Fund, the Opportunity Fund and Northeast Capital Management.[188]  The request is denied as to all other Defendants on Counts IV-X.

As to Counts I–III and XI, the result is different.  Counts I–III seek to set aside various transfers under actual and constructive fraudulent conveyance theories brought under the Bankruptcy Code and through importation of state law, and thus those claims must remain in this Court.  Fraudulent transfer actions, whether brought under § 544(b) or § 548, do not belong to a debtor; "[t]hey are creatures of statute, available in bankruptcy solely for the benefit of creditors of the debtor, whose rights the trustee enforces."[189] "[C]reditors may not be compelled indirectly through their representative to arbitrate fraudulent transfer claims pursuant to a pre-petition contract to which they were not parties."[190]  Count XI is a request pursuant to § 543 for turnover of Debtor's books and records, which belong to the estate.  This Count arises under the Bankruptcy Code and is a core proceeding.  As neither creditors nor the estate are parties to either limited partnership agreement or bound by it, Counts I-III and XI are not subject to arbitration.

The final issue is whether to grant Defendants' request to stay any non-arbitrable claims pending arbitration.[191]  Plaintiffs oppose that request and argue that if any claims are arbitrable, I should allow all non-arbitrable claims to proceed before compelling arbitration.[192]  Although it perhaps may be more efficient to stay the remaining claims while

---

[188]  While it is not entirely clear that the arbitration provision was meant to cover suits between a former and successor general partner, technically both are parties to the limited partnership agreement although not contemporaneously.

[189]  *In re AstroPower Liquidating Trust*, 335 B.R. at 326 (quoting *OHC Liquidation Trust v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.)*, No. 02–13396PJW, Adv. No. 04–56928PBL, 2005 WL 670310, at *4–5 (Bankr. D. Del. Mar. 18, 2005)).

[190]  *In re AstroPower Liquidating Trust*, 335 B.R. at 326.

[191]  Defendants' Opening Brief 23–24.

[192]  Hr'g Tr. 78:20–80:1, Nov. 30, 2016.  *See also Pardo v. Pacificare of Tex., Inc. (In re AFP Co.)*, 264 B.R. 344 (Bankr. D. Del. 2001).

arbitration is pending, judicial efficiency alone is not a sufficient reason for a court to "refuse to exercise its jurisdiction in favor of proceedings in an alternative forum."[193] Courts ought to be cautious in staying litigation while arbitration is pending, because staying litigation for that reason may effectively deny the plaintiff its day in court.[194] Indeed, [t]he right to litigate would mean little if the substance of the litigation, when [the plaintiff's] day in court finally dawns, may be driven by something that may have occurred during arbitration."[195]

Plaintiffs have a right to litigate their fraudulent transfer claims (Counts I-III) and turnover claim (Count XI) against all Defendants. The prosecution of these counts will not be stayed. The fraudulent conveyance counts assert that Debtor transferred funds or assets that it received or had a right to receive with the actual intent to harm its creditors or in exchange for no value. These claims are not based on the limited partnership agreement and there could be actionable claims even if certain actions taken by Defendants comported with the limited partnership agreements. The turnover action seeks to obtain the Debtor's books and records in the possession of other parties.

As to the remaining counts, I will stay prosecution of Counts VI (Breach of Contract), VII (Conversion) and IX (Unjust Enrichment). In these counts, Plaintiffs seeks to recover fees allegedly owed to Debtor under the Capital Fund LPA and the Opportunity Fund LPA and redress for the removal of Debtor as general partner of those partnerships. Recovery for these alleged wrongs are directly impacted by relevant provisions of the limited

---

[193] *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 139 (3d Cir. 2004).
[194] *Id.*
[195] *Id.*

partnership agreement and are directed, in the first instance, at the Capital Fund and the Opportunity Fund.

On the other hand, I will not stay prosecution of Counts IV (Breach of Fiduciary Duty), Count V (Breach of the Fiduciary Duty of Loyalty), Count VIII (Aiding and Abetting Breaches of Fiduciary Duty) and Count X (Accounting). In the first three of these counts, Plaintiffs allege that Debtor's managers, Schepis and Canelas (as well as the remaining Defendants, which they controlled), breached their fiduciary duties to the Debtors or aided and abetted the breaches of others. These alleged breaches are not based on provisions of the Capital Fund LPA or the Opportunity Fund LPA, but on fiduciary obligations arising under state law and/or Debtor's limited liability company agreement.[196] Similarly, the request for an accounting is not grounded in the limited partnership agreements. To retain these counts but stay prosecution pending arbitration would effectively deny Plaintiffs their day in court against Defendants at the center of the Complaint. Such a result would take away with one hand the very thing awarded with the other. That I will not do. Defendants' request for a total stay of this adversary proceeding pending arbitration is denied.

To summarize, I will compel arbitration of Counts IV–X against the Capital Fund, the Opportunity Fund and Northeast Capital Management. I will stay prosecution of Counts VI, VII and IX against all other Defendants. I will not stay prosecution of Counts IV, V, VIII and X against all other Defendants. Counts I—III and XI may proceed against all Defendants.

---

[196] The Debtor's constituent documents have not been provided.

III.    **The Exculpation Provisions in the Limited Partnership Agreement Do Not Compel Dismissal of the Complaint**

Defendants argue that Plaintiffs' breach of fiduciary duty claims (Counts IV, V, and VIII) fail to state a claim on which relief can be granted because of the exculpation provisions in the limited partnership agreements.[197]  Plaintiffs respond by arguing that the exculpation provisions do not apply to at least ten Defendants, that their claims fall within the clause's exception, and that Defendants have duties under Delaware law regardless.[198] In their reply, Defendants distinguish cases cited by Plaintiffs involving corporations and argue that Plaintiffs' Complaint pleads breaches of the duty of loyalty, but that the exculpation clause removes liability for a breach of the duty of loyalty and such a breach does not fall into the exceptions in the exculpation clause.[199]  Defendants conclude by arguing that Defendants are included in the exculpation clause as "Affiliates" of the General Partner.

The exculpation clauses in the limited partnership agreements, which are identical, provide that:

> The *General Partner* and its respective officers, partners, shareholders, directors, members, managers, agents, employees and Affiliates *shall not be personally liable to the Partnership* or the *Limited Partners* for any act of commission or omission, except if the General Partner or its respective officers, partners, shareholders, directors, members, managers, agents, employees

---

[197] Defendants' Opening Brief contains several variations on this argument, including that Plaintiffs only alleged "generalized fiduciary duties based on breach of loyalty" instead of the specific exceptions for fraud, willful misconduct or gross negligence delineated in the limited partnership agreements, Defendants' Opening Brief 25; that Plaintiffs are not complying with proper rules for derivative lawsuits, *id.* at 26; that Northeast Capital Management replaced Debtor as the general partner of the funds and is the only party with the right to assert these claims, *id.* at 28; and that punitive damages are not available for breach of duty claims, *id.* None of these arguments appear in Defendants' Reply Brief.

[198] Plaintiffs' Answering Brief 20–22.

[199] Defendants' Reply Brief 16–18.

> or Affiliates are guilty of fraud, willful misconduct or gross negligence.[200]

By its terms, therefore, the general partner is on the receiving end of exculpation from the partnership and limited partners.  Plaintiffs' claims here present the reverse situation.  Neither partnership (Capital Fund or Opportunity Fund) is suing the general partner (Debtor) or any of Debtors' shareholders, managers, etc.  Indeed, Capital Fund and Opportunity Fund are not suing any party.  Rather, Plaintiffs are suing on Debtor's claims, in other words, bringing the claims of the General Partner against the Partnership.  There is no exculpation running in that direction.

Further, even if the exculpation clauses covered Plaintiffs' claims, Plaintiffs' claims arguably fall within the exception.  Counts IV, V, and VIII allege breach of fiduciary duty, breach of loyalty, and aiding and abetting breaches of fiduciary duty respectively.  The exculpation clause carves out claims for fraud, willful misconduct, and gross negligence.  Under Delaware law, "[g]ross negligence is the standard for evaluating a breach of the duty of care,"[201] and "[w]illful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith."[202]  Thus, by carving out willful misconduct and gross negligence, the exculpation clause does not remove liability for (1) breach of the duty of care and (2) at least one way of evaluating breach of the duty of loyalty.  Reading the allegations in the Complaint favorably to Plaintiffs, their allegations fall within these exceptions.

The Motion to Dismiss based on the exculpation clause is denied.

---

[200] Capital Fund LPA Section 12.01 (emphasis added), Brogan Declaration Ex. A, at 28; Opportunity Fund LPA Section 13.01 (emphasis added), Brogan Declaration Ex. B, at 27-28.
[201] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012).
[202] *Id.*

**IV.    None of Defendants' Remaining Arguments Warrant Dismissal of the Complaint**

Defendants seek to dismiss the complaint on multiple other grounds. Some of the discussion of these remaining grounds is little more than a paragraph, or even a sentence. I address certain of the remaining arguments below. I deny the Motion to Dismiss to the extent that it is based on any remaining argument that is not discussed.

1.    *Non-Core Claims.* Defendants argue that Counts I–X are non-core claims and thus I may not enter a final order on those claims. Defendants are not contesting subject matter jurisdiction. Defendants are exercising their right to not consent to entry of final judgments by the bankruptcy court on any non-core claims. This matter does not require a determination of the core/non-core status of Plaintiffs' claims, and I leave that analysis for another day.

2.    *Cayman Law on Derivative Suits.* In their Opening Brief, Defendants contend that all claims must be dismissed against all Cayman Defendants because Cayman Islands law prohibits derivative shareholder suits,[203] and that creditors have no standing to assert claims derivatively on Debtor's behalf.[204] In their Reply Brief, Defendants refer to only two of the Cayman Defendants—Pursuit Capital Partners Cayman (Ltd.) and Pursuit Capital Master (Cayman Ltd.). In response to questions at argument, Defendants stated that they are relying on the unitary enterprise theory to show that somehow the claims against the Cayman Defendants must be derivative and not direct. Defendants admitted that they were not "precise" in their contentions with respect to derivative standing, neither evaluating the relationship between the Debtor and each Cayman Defendant nor the relationship between

---

[203] Defendants' Opening Brief 28–29.
[204] *Id.* at 26.

the claims asserted in the Complaint and each Cayman Defendant.[205]  Plaintiffs expressed confusion with respect to Defendants' contentions, but in any event argue that they are asserting direct claims against each Cayman Defendant.

After reviewing the briefing and the transcript of the argument, I conclude that Defendants' contentions with respect to derivative standing are too imprecise, and my attempt to ferret out the contentions at argument was unsuccessful.  Defendants' request for dismissal on this basis will be denied.[206]

3.    *Failure to State a Claim Upon Which Relief Can Be Granted.*  Defendants argue that Counts IV and V must be dismissed for failure to state a claim for breach of fiduciary duty and that Count VIII must be dismissed for failure to state a claim for aiding and abetting a breach of fiduciary duty.  The arguments directed to Counts IV and V comprise two paragraphs and are based on the exculpation clause in the limited partnership agreements and on a general statement that Plaintiffs have not alleged that Debtor, as general partner, "is an investor in or creditor[] of any of the corporate entities . . . ."[207]  The exculpation argument has been addressed above.  The derivative standing argument here is also imprecise, and does not take into account the allegations that Defendants were acting as a unitary enterprise.

Defendants' arguments directed to Count VIII largely repeat arguments already dealt with in this section and those requests will be denied for the same reasons.[208]  Defendants also point out that Plaintiffs have not sufficiently alleged that Defendants are a "third party"

---

[205] Hr'g Tr. 109, Nov. 30, 2016.
[206] *See Action Auto Stores, Inc. v. United Capitol Ins. Co.*, 845 F. Supp. 417 (W.D. Mich. 1993) (the court denied a motion for summary judgment based upon insufficient briefing).
[207] Defendants' Opening Brief 25–26.
[208] *Id.* at 30–31.

that could have misled the directors into a breach. I find Plaintiffs allegations to be sufficient in this regard. And to the extent that Defendants argue that Plaintiffs cannot plead in the alternative (alleging that a Defendant both breached a fiduciary duty and aided and abetted a breach of fiduciary duty), Fed. R. Civ. P. 8(d)(3) forecloses that argument at the pleading stage.

Defendants argue that Count IX must be dismissed because a claim for unjust enrichment cannot stand in the face of an express contract. The express contracts Defendants refer to are the limited partnership agreements. Plaintiffs are entitled to plead in the alternative, and Defendants have raised no other basis for dismissal of this count.

For all these reasons, Defendants' request for dismissal because Counts IV, V, VIII and IX fail to state a claim upon which relief can be granted will be denied.

4. *Judicial Estoppel.* Defendants argue that the doctrine of judicial estoppel prevents Plaintiffs from taking a position in this lawsuit that is contrary to a position taken by Alpha Beta Capital Partners, L.P. in its case against Pursuit Investment Management LLC in Connecticut state court.[209] Defendants state that Alpha Beta is in privity with Plaintiffs and thus I should attribute Alpha Beta's position in the Connecticut case to Plaintiffs' position here. Defendants urge that it is inconsistent for Alpha Beta to have taken the position that "no incentive fee should be paid with respect to the UBS settlement"[210] in the Connecticut case while Plaintiffs argue here that Debtor "should have earned an incentive fee."[211] Plaintiffs counter that the parties and facts in the Connecticut case are different than the parties and facts here such that judicial estoppel is inapplicable.[212]

[209] Defendants' First Supplemental Brief 23–28.
[210] *Id.* at 24.
[211] *Id.*
[212] Plaintiffs' Second Supplemental Brief 13–15.

The doctrine of judicial estoppel prevents "a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency."[213] The application of judicial estoppel requires the following: (i) "the party to be estopped must have taken two positions that are irreconcilably inconsistent,"[214] (ii) the party must have changed his position "'in bad faith—i.e., with intent to play fast and loose with the court'"[215] and (iii) "no lesser sanction would adequately remedy . . . the litigant's misconduct."[216] I will not apply judicial estoppel here.  While Alpha Beta is one of the parties to the Agreement and has authorized Plaintiffs to bring the claims on their behalf,[217] the claims asserted in this action belonged to Debtor, not to Alpha Beta.  Debtor was not a party to the Connecticut Action[218] and therefore made no representations in the Connecticut Action. Further, Defendants represent that the decision in the Connecticut Action is (i) based on agreements not involved in this matter and (ii) "the Connecticut Court's decision on those matters related to the relation between any of the Defendants and Alpha Beta is not relevant to the Complaint."[219]  Under these circumstances, I will not grant the Motion to Dismiss on judicial estoppel grounds.

---

[213] *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).

[214] *Id.*

[215] *Id.* (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996)).

[216] *Id.* at 779–80 (citing *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999)).

[217] Complaint ¶ 8.

[218] Defendants' First Supplemental Brief Annex 1, at 4.

[219] Defendants' Second Supplemental Brief 13.

**Conclusion**

An Order will enter consistent with the above rulings.

Dated: November 2, 2018

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE